Harriet G. WEGNER, Petitioner,
Appellant,

v.

MILWAUKEE MUTUAL INSURANCE
COMPANY, Petitioner,
Respondent,

The City of Minneapolis, Respondent.

No. C6–90–1400.

Supreme Court of Minnesota.

Dec. 13, 1991.

Rehearing Denied Jan. 27, 1992.

James P. Westphal, Victor P. Seiler &
Associates, Minneapolis, for appellant.

William M. Drinane, Peterson, Bell, Converse & Jensen, for Milwaukee Mut. Ins.
Co.

Gail Langfield, Marshall & Associates,
P.A., Circle Pines, for City of Minneapolis.

TOMLJANOVICH, Justice.

The Minneapolis police department severely damaged a house owned by Harriet
G. Wegner while attempting to apprehend
an armed suspect. Wegner sought compensation from the City of Minneapolis on
trespass and constitutional "taking" theo-

ries. The district court granted the City's motion for summary judgment on the "taking" issue. The court of appeals affirmed, reasoning that although there was a "taking" within the meaning of the Minnesota Constitution, the "taking" was noncompensable under the doctrine of public necessity. We reverse.

The salient facts are not in dispute. Around 6:30 p.m. on August 27, 1986, Minneapolis police were staking out an address in Northeast Minneapolis in the hope of apprehending two suspected felons who were believed to be coming to that address to sell stolen narcotics. The suspects arrived at the address with the stolen narcotics. Before arrests could be made, however, the suspects spotted the police and fled in their car at a high rate of speed with the police in pursuit. Eventually, the suspects abandoned their vehicle, separated and fled on foot. The police exchanged gunfire with one suspect as he fled. This suspect later entered the house of Harriet G. Wegner (Wegner) and hid in the front closet. Wegner's granddaughter, who was living at the house, and her fiance then fled the premises and notified the police.

The police immediately surrounded the house and shortly thereafter called an "Operation 100" around 7:00 p.m. The term "Operation 100" refers to the calling of the Minneapolis Police Department's Emergency Response Unit (ERU) to the scene. The ERU, commonly thought of as a "SWAT" team, consists of personnel specially trained to deal with barricaded suspects, hostage-taking, or similar high-risk situations. Throughout the standoff, the police used a bullhorn and telephone in an attempt to communicate with the suspect. The police, receiving no response, continued efforts to establish contact with the suspect until around 10:00 p.m. At that time the police decided, according to ERU procedure, to take the next step in a barricaded suspect situation, which was to deliver chemical munitions. The police fired at least 25 rounds of chemical munitions or "tear gas" into the house in an attempt to expel the suspect. The police delivered the tear gas to every level of the house, breaking virtually every window in the process.

In addition to the tear gas, the police cast three concussion or "flash-bang" grenades into the house to confuse the suspect. The police then entered the home and apprehended the suspect crawling out of a basement window.

The tear gas and flash-bang grenades caused extensive damage to the Wegner house. For example: a pink film from the tear gas covered the walls and furniture; some walls were dented from the impact of the tear gas canisters; one tear gas canister went through one of the upstairs walls. Wegner alleges damages of $71,000. The City denied Wegner's request for reimbursement, so she turned to her insurance carrier, Milwaukee Mutual Insurance Company (Milwaukee Mutual) for coverage. Milwaukee Mutual paid Wegner $26,595.88 for structural damage, $1,410.06 for emergency board and glass repair and denied coverage for the rest of the claim. Milwaukee Mutual is subrogated to the claims of Wegner against the City to the extent of its payments under the policy.

Wegner commenced an action against both the City of Minneapolis and Milwaukee Mutual to recover the remaining damages. In conjunction with a trespass claim against the City, Wegner asserted that the police department's actions constituted a compensable taking under Minn. Const. art. I, § 13. Milwaukee Mutual cross-claimed against the City for its subrogation interest and any additional amounts the insurer may be found liable for in the future.

Milwaukee Mutual and the City both brought motions for summary judgment on all claims. The district court granted partial summary judgment in favor of the City on the "taking" issue, holding that "Eminent domain is not intended as a limitation on [the] police power." Both Wegner and Milwaukee Mutual appealed the trial court's determination.

The court of appeals affirmed the trial court, reasoning that although there was a "taking" within the meaning of Minn. Const. art. I, § 13, the "taking" was noncompensable under the doctrine of public

necessity. *Wegner v. Milwaukee Mut. Ins. Co.*, 464 N.W.2d 543 (Minn.App.1990).

## I.

■ Article I, section 13, of the Minnesota Constitution provides: "Private property shall not be taken, destroyed or damaged for public use without just compensation, first paid or secured." This provision "imposes a condition on the exercise of the state's inherent supremacy over private property rights." *Johnson v. City of Plymouth*, 263 N.W.2d 603, 605 (Minn. 1978). This type of constitutional inhibition "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960).

■ The purpose of the damage clause is to ensure that private landowners are compensated, not only for physical invasion of their property, but also damages caused by the state where no physical invasion has occurred. *In re Hull*, 163 Minn. 439, 451, 204 N.W. 534, 539 (1925), *error dismissed sub nom., Breen v. Hull*, 275 U.S. 491, 48 S.Ct. 33, 72 L.Ed. 390 (1927).[1] A more significant restriction on recovery under this provision is the requirement that the taking or damaging must be for a public use. *AFSCME Councils 6, 14, 65 and 96 v. Sundquist*, 338 N.W.2d 560, 575 (Minn. 1983), *appeal dismissed sub nom., Minneapolis Police Relief Assn. v. Sundquist*, 466 U.S. 933, 104 S.Ct. 1902, 80 L.Ed.2d 452 (1984). What constitutes a public use under this provision is a judicial question which this court historically construes broadly. *City of Duluth v. State*, 390 N.W.2d 757, 763 (Minn.1986).

The City contends there was no taking for a public use because the actions of the police constituted a legitimate exercise of the police power. The police power in its nature is indefinable.[2] *Kiges v. City of St. Paul*, 240 Minn. 522, 530, 62 N.W.2d 363, 369 (1953). However, simply labeling the actions of the police as an exercise of the police power "cannot justify the disregard of the constitutional inhibitions." *Petition of Dreosch*, 233 Minn. 274, 282, 47 N.W.2d 106, 111 (1951).

The City argues that Wegner and Milwaukee Mutual are confusing the concept of police power and eminent domain. We agree that this is not an eminent domain action and should not be analyzed as such. This action is based on the plain meaning of the language of Minn. Const. art I, § 13, which requires compensation when property is damaged for a public use. Consequently, the issue in this case is not the reasonableness of the use of chemical munitions to extricate the barricaded suspect but rather whether the exercise of the city's admittedly legitimate police power resulted in a "taking".

In resolving this case of first impression, the well-reasoned decision of *Steele v. City of Houston*, 603 S.W.2d 786 (Tex.1980) provides guidance. In *Steele*, the Texas Supreme Court addressed a constitutional taking claim involving facts strikingly similar to the present case. There, a group of escaped prisoners had taken refuge in a house apparently selected at random. After discovering the prisoners in the house, the Houston police discharged incendiary material into the house for the purpose of causing the house to catch fire. The police

---

1. *Hull* defines the term 'damaged' as referring to damages which could have been recovered at common law had the acts been done without statutory or constitutional authority. The harm suffered must be individual and not the same suffered by the public as a whole. *Id.*, 163 Minn. at 450–51, 204 N.W. at 538–39.

2. One commentator explained:
   [The police power] is used by the court to identify those state and local governmental restrictions and prohibitions which are valid and which may be invoked without payment of compensation. In its best known and most traditional uses, the police power is employed to protect the health, safety, and morals of the community in the form of such things as fire regulations, garbage disposal control, and restrictions upon prostitution and liquor. But it has never been thought that government authority under the police power was limited to those narrow uses.
   Sax, *Takings and the Police Power,* 74 Yale L.J. 36, n. 6 (1966).

allegedly let the house burn, even after the fire department arrived, in order to ensure all the prisoners had been forced out. The court, interpreting the taking provision of the Texas Constitution, which is virtually identical to the Minnesota taking provision,[3] stated, "this court has moved beyond the earlier notion that the government's duty to pay for taking property rights is excused by labeling the taking as an exercise of police powers." *Id.* at 789. In discussing the city's governmental immunity argument, the court stated:

> The Constitution itself is the authorization for compensation for the destruction of property and is a waiver of governmental immunity for the taking, damaging or destruction of property for public use.

The court further stated:

> The City argues that the destruction of the property as a means to apprehend escapees is a classic instance of police power exercised for the safety of the public. We do not hold that the police officers wrongfully ordered the destruction of the dwelling; we hold that the innocent third parties are entitled by the Constitution to compensation for their property.[4]

*Id.* at 791, 793. The court reversed the grant of summary judgment and remanded the case to the trial court so the plaintiffs could prove that the house was intentionally set on fire and that the destruction of the house and its contents was for a public use.

It is unnecessary to remand this case for a determination of whether the police intentionally damaged the Wegner house for a public use. It is undisputed the police in-

tentionally fired tear gas and concussion grenades into the Wegner house. Similarly, it is clear that the damage inflicted by the police in the course of capturing a dangerous suspect was for a public use within the meaning of the constitution.

The court of appeals cited the *Steele* decision for the simple proposition that the apprehension of criminal suspects has been held to be a public use but did not address the rest of the case despite the factual similarities to the case at bar. Instead, the court of appeals placed heavy reliance on the Georgia Intermediate Court of Appeals case of *McCoy v. Sanders*, 113 Ga.App. 565, 148 S.E.2d 902 (1966). The *McCoy* court held the draining of a pond by the police while searching for a murder victim's body was a proper exercise of the police power not requiring compensation under the Georgia Constitution. *Id.*, 113 Ga.App. at 566, 148 S.E.2d at 903. As in *Steele*, the Georgia Constitution also mirrors the Minnesota Constitution.[5] The Georgia courts, however, interpret the damage provision of their constitution as limited to those situations where there is physical interference with the property "in connection with an improvement for public use." *Id.*, 113 Ga.App. at 569, 148 S.E.2d at 905. This court never has held that the takings provision of Minn. Const. art. I, § 13 is to be applied in such a limited way. *See Dreosch*, 233 Minn. at 281, 47 N.W.2d at 110. We believe the *Steele* decision is more directly on point and provides a much better analysis than *McCoy*.

■ We hold that where an innocent third party's property is damaged by the police in the course of apprehending a sus-

---

**3.** Article I, Section 17 of the Texas Constitution provides:

> No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person; and, when taken, except for the use of the State, such compensation shall be first made, or secured by a deposit of money * * *.

**4.** It is noteworthy that the Texas court did not address the lawfulness of the police actions in this case. The court did not need to reach that issue because it only needed to decide whether

the house was damaged for a public use. *See Ginter v. Stallcup*, 869 F.2d 384, 388 n. 5 (8th Cir.1989). Correspondingly, this court need not address the propriety of the police's actions but need only resolve the issue of whether the conduct of the police gives rise to a right of compensation for the damage.

**5.** Article I, Section III, Paragraph I of the Georgia Constitution provides:

> Private property shall not be taken, or damaged, for public purposes, without just and adequate compensation being first paid.

pect, that property is damaged within the meaning of the constitution.

## II.

■ We briefly address the application of the doctrine of public necessity to these facts. The Restatement (Second) of Torts § 196 describes the doctrine as follows:

> One is privileged to enter land in the possession of another if it is, or if the actor reasonably believes it to be, necessary for the purpose of averting an imminent public disaster.[6]

*See McDonald v. City of Red Wing*, 13 Minn. 38 (Gil. 25) (1868) (city excused from paying compensation under the doctrine of "public safety" where city officers destroyed building to prevent the spread of fire). Prosser, apparently somewhat troubled by the potential harsh outcomes of this doctrine, states:

> It would seem that the moral obligation upon the group affected to make compensation in such a case should be recognized by the law, but recovery usually has been denied.

Prosser and Keeton, *The Law of Torts*, § 24 (5th ed. 1984); *see also Restatement (Second) of Torts* § 196 comment h. Here, the police were attempting to apprehend a dangerous felon who had fired shots at pursuing officers. The capture of this individual most certainly was beneficial to the whole community. In such circumstances, an individual in Wegner's position should not be forced to bear the entire cost of a benefit conferred on the community as a whole.

Although the court of appeals found there to be a "taking" under Minn. Const. art. I, § 13, the court ruled the "taking" was noncompensable based on the doctrine of public necessity. We do not agree.

Once a "taking" is found, compensation is required by operation of law. Thus, if the doctrine of public necessity were to apply to a given fact situation, no taking could be found under Minn. Const. art. I, § 13.

We are not inclined to allow the city to defend its actions on the grounds of public necessity under the facts of this case. *But see Steele*, 603 S.W.2d at 792. We believe the better rule, in situations where an innocent third party's property is taken, damaged or destroyed by the police in the course of apprehending a suspect, is for the municipality to compensate the innocent party for the resulting damages. The policy considerations in this case center around the basic notions of fairness and justice. At its most basic level, the issue is whether it is fair to allocate the entire risk of loss to an innocent homeowner for the good of the public. We do not believe the imposition of such a burden on the innocent citizens of this state would square with the underlying principles of our system of justice. Therefore, the City must reimburse Wegner for the losses sustained.

As a final note, we hold that the individual police officers, who were acting in the public interest, cannot be held personally liable. Instead, the citizens of the City should all bear the cost of the benefit conferred.

The judgments of the courts below are reversed and the cause remanded for trial on the issue of damages.

Affirmed in part, reversed in part and remanded.

---

**6.** Prosser explains:

> Where the danger affects the entire community, or so many people that the public interest is involved, that interest serves as a complete justification to the defendant who acts to avert the peril to all. Thus, one who dynamites a house to stop the spread of a conflagration that threatens a town, or shoots a mad dog in the street, or burns clothing infected with smallpox germs, or in time of war, destroys property which should not be allowed to fall into the hands of the enemy, is not liable to the owner, so long as the emergency is great enough, and he has acted reasonably under the circumstances. This notion does not require the "champion of the public" to pay for the general salvation out of his own pocket. The number of persons who must be endangered in order to create a public necessity has not been determined by the courts.

Prosser and Keeton, *The Law of Torts*, § 24 (5th ed.1984).