Thomas DOKMAN, Appellant,

v.

### COUNTY OF HENNEPIN, et al., Respondents.

No. C8–01–827.

Court of Appeals of Minnesota.

Dec. 18, 2001.

Robert Bennett, Heidi Ann Schneider, Eric Hageman, Gartner, Bennett & Schupp, P.C., Minneapolis, MN, for appellant.

Amy Klobuchar, Hennepin County Attorney, Toni A. Beitz, Assistant County Attorney, Minneapolis, MN, for respondents.

Considered and decided by SCHUMACHER, Presiding Judge, KLAPHAKE, Judge, and PETERSON, Judge.

## OPINION

KLAPHAKE, Judge.

Appellant Thomas Dokman sued respondents Hennepin County, Hennepin County Sheriff's Department, Sheriff Patrick D. McGowan in his official capacity, and deputy sheriffs William Wilen, Rocky Fontana, and John Cich (officers), individually and in their official capacity. He alleged violations of his constitutional rights under the Fourth, Fifth, and Fourteenth Amendments, assault, battery, false imprisonment, and infliction of emotional distress arising out of a stand-off situation with deputies at his house. Dokman challenges the district court's grant of summary judgment to the officers on immunity grounds.

Because the officers had probable cause to arrest Dokman and their actions were protected by statutory and official immunity, we affirm.

## FACTS

On November 16, 1996, Dokman called his estranged wife, Therese Dokman and became angry when she refused to come to his house. Threatening to kill himself, Dokman clicked a shotgun multiple times into the phone attempting to make Therese Dokman believe he would carry out his threat. Dokman later testified that he wanted only to scare her into thinking that he would commit suicide.

Therese Dokman called the police. When the officers arrived at Dokman's home, he was not cooperative, refusing to come out of the house and thwarting attempts to communicate over the telephone. The officers repeatedly attempted to establish contact. Dr. Steven Geiger, the police psychologist on site, noted that Dokman's "responses were irrational and no[t] fit for the situation." For example, Dokman would answer the telephone and say: "You are not a very good at telemarketing"; "We don't subscribe to Sears or anybody else"; "Dokman's summer home; some are home, some are not."

Approximately 15 minutes after the initial call, Therese Dokman called the dispatcher to ensure that the officers did not leave Dokman alone and requested that he be taken to the hospital for a psychological evaluation. In later conversations that night, Therese Dokman informed the officers that Dokman was abusive and had a drinking problem, but she indicated that Dokman did not sound intoxicated. The officers eventually disconnected Dokman's telephone, thus preventing him from communicating with Therese Dokman. Although Dokman made no further threats of suicide and officers never saw him with a weapon, he continually refused to leave his house.

Throughout the evening and into the early morning hours, Dokman ignored the officers' requests to talk or to come outside. While officers surrounded the house, Dokman watched television, turned lights on and off, and opened and closed curtains. The police reports indicate that at various times during the evening they were unsure of Dokman's location in the house. At one point, Dokman yelled to the officers that he was fine and they should leave.

After a considerable amount of time without any contact with Dokman, the officers threw a "hostage phone" through the kitchen window. Hostage phones enable officers to hear inside the house without having someone pick up the receiver. After a short conversation with the officers at 1:54 a.m., Dokman left his house, walked to the garage, and then turned and ran back inside the house. This behavior raised the officers' suspicions.

Nine hours after the commencement of negotiations, the officers evaluated the next action they should take to persuade Dokman to exit the house. They considered three options: (1) enter the house; (2) wait; or (3) use chemical irritants to force Dokman out. Concerned that Dokman wanted to force a shoot-out, resulting in "suicide by cop," the officers decided that entering the house was too dangerous. The option to wait was rejected because the officers were not sure if Dokman was alive. They chose to use pepper spray to force Dokman out of the house.

Dokman received general warnings that chemical munitions would be shot into the house if he did not come out. After waiting approximately 30 minutes, the officers fired 21 canisters into the house, resulting in significant destruction to the windows, walls, and a patio door. The officers tele-

phoned Dokman and asked if he was hurt, and he responded that he was okay, but he may have glass in one eye. Dokman refused medical treatment from the ambulance parked outside his house and refused to leave the house.

After the chemicals were shot into the house, Dokman's communication with the officers increased. By 5:00 a.m., almost three hours after the chemical munitions had entered the house, the Emergency Services Unit determined Dokman was no longer a threat and left the scene. An officer stayed outside Dokman's home until later that day.

Dokman brought an action against the officers for violations of his constitutional rights, assault, battery, false imprisonment, and infliction of emotional distress. The officers moved for summary judgment, arguing that their actions were protected by qualified and official immunity. The district court granted their motion for summary judgment. This appeal followed.

### ISSUES

1. Did the district court err in granting the officers' motion for summary judgment on the issue of qualified immunity?

2. Did the district court err in granting the officers' motion for summary judgment on the issue of official immunity?

### ANALYSIS

In an appeal from an order granting summary judgment, we must determine if there are genuine issues of material fact in dispute and whether the district court erred in its application of the law. *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990). No genuine issue of material fact exists "['w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *DLH, Inc. v. Russ*, 566 N.W.2d 60, 69 (Minn.1997) (quoting *Mat-*

*sushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). "[T]he party resisting summary judgment must do more than rest on mere averments." *Id.* at 71. This court views the evidence in the light most favorable to the party against whom summary judgment was granted. *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993).

The district court determined that the officers were entitled to qualified and official immunity for their actions at the Dokman residence. Whether immunity applies is a legal question, which is reviewed de novo. *Gleason v. Metro. Council Transit Operations*, 582 N.W.2d 216, 219 (Minn.1998). The party asserting a defense of immunity has the burden of demonstrating facts showing that it is entitled to immunity. *Gerber v. Neveaux*, 578 N.W.2d 399, 402 (Minn.App.1998), *review denied* (Minn. July 16, 1998).

### I.

A governmental official performing discretionary functions is entitled to qualified immunity if the official's conduct does not violate clearly established constitutional or statutory rights that a reasonable person would have known. *Adewale v. Whalen*, 21 F.Supp.2d 1006, 1013 (D.Minn.1998). The doctrine is broad enough to protect "'all but the plainly incompetent or those who knowingly violate the law.'" *Stone v. Badgerow*, 511 N.W.2d 747, 751 (Minn.App.1994) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)), *review denied* (Minn. Apr. 19, 1994). Because it is an affirmative defense, the official seeking immunity bears the initial burden to plead the defense, but once raised, the plaintiff must establish that the official's action was "objectively legally unrea-

sonable." *Id.* (quotation omitted). A police officer is denied qualified immunity only where "it is obvious that no reasonably competent police officer would have concluded" that his actions were legal. *Malley*, 475 U.S. at 342, 106 S.Ct. at 1096.

■ Evaluating a claim of qualified immunity involves two inquiries: (1) "whether the plaintiff has alleged the violation of a clearly established constitutional right"; and (2) whether an officer could reasonably have believed his actions were lawful "in light of clearly established law and the information [he] possessed." *Baker v. Chaplin*, 517 N.W.2d 911, 914 (Minn.1994) (citation omitted). Dokman has alleged violations of his Fourth, Fifth, and Fourteenth Amendment rights.

### A. Fourth Amendment

Dokman asserts that the officers violated his Fourth Amendment right to be free from unlawful search and seizure. Minnesota uses the *Mendenhall/Royer* approach to determine whether a seizure has taken place. *State v. Hanson*, 504 N.W.2d 219, 220 & n. 1 (Minn.1993) (citing *United States v. Mendenhall*, 446 U.S. 544, 554–55, 100 S.Ct. 1870, 1877–78, 64 L.Ed.2d 497 (1980); *Fla. v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983)).

■ Under the *Mendenhall/Royer* approach, the reviewing court asks whether, looking at all the facts, a reasonable person in Dokman's circumstances would see the police conduct as an attempt to capture, seize, or otherwise to significantly intrude on his freedom of movement. *See Michigan v. Chesternut*, 486 U.S. 567, 572–75, 108 S.Ct. 1975, 1978–80, 100 L.Ed.2d 565 (1988).

■ In *Mendenhall*, the Court elaborated on this approach by stating:

We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877 (citation omitted). Here, in view of all the circumstances, a reasonable person in Dokman's situation would have interpreted the situation as an infringement on his freedom to leave or a seizure.

■ Next, the court examines whether the officers could reasonably have believed their actions were lawful in light of clearly established law and the information they possessed. *Chaplin*, 517 N.W.2d at 914 (quotation omitted). The officers were acting under the belief that Dokman was a danger to himself.

A peace or health officer may take a person into custody and transport the person to a licensed physician or treatment facility if the officer has reason to believe, either through direct observation of the person's behavior, or upon reliable information of the person's recent behavior and knowledge of the person's past behavior or psychiatric treatment, that the person is mentally ill * * * and in imminent danger of injur-

ing self or others if not immediately restrained.

Minn.Stat. § 253B.05 subd. 2(a). The officers acted on information from Therese Dokman that Dokman (1) was suicidal; (2) had a shotgun; (3) had a drinking problem; and (4) was abusive. Officers considered this information credible and were justified in attempting to take Dokman into custody because he appeared to be a danger to himself. Thus, the court's conclusion that the officers were entitled to qualified immunity is not erroneous.

*Excessive Force*

▆▆▆ Dokman argues that the act of shooting 21 chemical munitions into his home constituted excessive force. The use of excessive force by officers constitutes a violation of the Fourth Amendment right to be free from unreasonable seizure and is actionable under 42 U.S.C. § 1983. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). The test for determining whether police officers have violated the Fourth Amendment by using excessive force is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstance confronting them, without regard to their underlying intent or motivation." *Id.* at 397, 109 S.Ct. at 1872. In assessing reasonableness of the use of force, the conduct must be judged "from the perspective of a reasonable officer on the scene." *Id.* at 396, 109 S.Ct. at 1872; *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987).

▆▆▆ Here, the officers were informed that Dokman was armed and suicidal, his behavior was unpredictable, and he had a history of abuse. The negotiating officers were forced to assess the situation moment by moment, and, because Dokman was giving unresponsive answers to the officers' inquiries and would not leave his house to

speak to them, they did not know the full extent of the threat.

Dokman claims that the officers used excessive amounts of pepper spray in an attempt to force him out of the house. But the officers submitted affidavits stating that the use of chemical munitions to force a person suspected of suicidal thoughts out of a house is not uncommon. After numerous attempts to negotiate with Dokman, it was not unreasonable for the officers to believe that the use of chemical munitions in a quantity sufficient to gain the desired objective was their best option at the time. Viewed from their perspective that they were dealing with a suicidal person, the officers' actions were reasonable and therefore not excessive, thus supporting their claim of qualified immunity.

*Deadly Force*

Dokman argues that the officers used deadly force in shooting the chemical munitions into his home. Deadly force is defined as

force which the actor uses with the purpose of causing, or which the actor should reasonably know creates a substantial risk of causing, death or great bodily harm.

Minn.Stat. § 609.066, subd. 1 (2000).

▆▆▆ While it is true that serious injury or death could result from shooting chemical munitions, that fact alone does not make the action one of deadly force. When an officer shoots a canister of pepper spray into a building, the officer has been trained to aim at the ceiling, rather than a person. There is no support in the record to conclude that these officers aimed directly at Dokman. The district court did not err in finding qualified immunity.

### B. Fifth Amendment

▆▆▆ Dokman argues that his home was taken for a public purpose without

just compensation. The Takings Clause of the Fifth Amendment to the United States Constitution states "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. X. This type of constitutional inhibition

> was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.

*Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). A significant restriction on recovery under this provision is the requirement that the taking or damaging must be for a public use. *AFSCME Councils 6, 14, 65 & 96 v. Sundquist*, 338 N.W.2d 560, 575 (Minn.1983), *appeal dismissed sub nom., Minneapolis Police Relief Ass'n v. Sundquist*, 466 U.S. 933, 104 S.Ct. 1902, 80 L.Ed.2d 452 (1984). What constitutes "public use" under this provision is a judicial question that the court historically construes broadly. *City of Duluth v. State*, 390 N.W.2d 757, 763 (Minn.1986).

■ Respondents contend there was no taking for a public use because the actions of the police officers constituted a legitimate exercise of police power.

> * * * What is a 'public purpose' that will justify the expenditure of public money is not capable of a precise definition, but the courts generally construe it to mean such an activity as will serve as a benefit to the community as a body and which, at the same time, is directly related to the functions of government.

*Hous. & Redevelopment Auth. of City of St. Paul v. Greenman*, 96 N.W.2d 673, 679, 255 Minn. 396, 403–04 (1959) (citation & quotation omitted). But, "simply labeling the actions of the police as an exercise of the police power cannot justify the disregard of the constitutional inhibitions." *Wegner v. Milwaukee Mut. Ins. Co.*, 479 N.W.2d 38, 40 (Minn.1991) (quotation omitted).

■ Dokman relies on *Wegner* for the proposition that the officers are not insulated from compensating an innocent third party. Police officers in *Wegner* were chasing a suspected armed criminal who fled into a home. *Wegner*, 479 N.W.2d at 39. The residents evacuated the home, and the officers forced the suspect out with tear gas, resulting in significant damage to the home. *Id.* The *Wegner* court found that the police took action for a public purpose, to apprehend a criminal, and, as innocent third parties, the residents were entitled to damages. *Id.* at 41. Here, the officers thought that Dokman was a threat to himself and potentially to other officers on the scene; Dokman was not an innocent third party. Thus, while the officers served a public function, it was not for the benefit of the community.

Dokman has shown the existence of no outstanding issues of material fact, and respondents are entitled as a matter of law to qualified immunity. The district court did not err in granting summary judgment based on qualified immunity.

### C. Fourteenth Amendment

Dokman argues that his substantive due process rights were violated when the officers staked out his house and bombarded him with chemical munitions without probable cause. The United States Supreme Court stated that if a claim is covered by a specific constitutional provision, that claim must be analyzed under those standards, not under substantive due process. *County of Sacramento v. Lewis*, 523 U.S. 833, 842, 118 S.Ct. 1708, 1714, 140 L.Ed.2d 1043 (1998) (citation omitted). Because we have found that a seizure occurred and Dokman's Fourth Amendment rights were not violated, we need not address the due process claim.

## II.

Under Minnesota law, a public official is entitled to official immunity from state law claims when the official's duties require the exercise of discretion or judgment. *Johnson v. Morris,* 453 N.W.2d 31, 41 (Minn.1990). Generally, police officers are discretionary officials. *Id.* at 42. Only when officials act outside the scope of their charged authority can they be deemed to have waived this immunity and be held personally liable for their negligence. *See generally Janklow v. Minn. Bd. of Exam'rs,* 552 N.W.2d 711, 715 (Minn.1996). An officer is not shielded from suit if he commits a willful or malicious wrong. *Rico v. State,* 472 N.W.2d 100, 106–07 (Minn.1991).

Official immunity is intended "to protect public officials from the fear of personal liability that might deter independent action." *Janklow,* 552 N.W.2d at 715 (quoting *Elwood v. Rice County,* 423 N.W.2d 671, 678 (Minn.1988)). It establishes that

> a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong.

*Elwood,* 423 N.W.2d at 677 (citation omitted). As a result, government officials have broad discretion to conduct business and make decisions under the protection of official immunity. *Janklow,* 552 N.W.2d at 716. Official immunity protects all discretionary decisions made by a public figure, but does not protect the "ministerial duties" of a public official, that is, duties that are "absolute, certain or imperative." *Watson v. Metro. Transit Comm'n,* 553 N.W.2d 406, 414 (Minn.1996) (quotation omitted).

Determination of whether official immunity is available in a given context requires a two-step inquiry: (1) whether the alleged acts are discretionary or ministerial; and (2) whether the alleged acts, even though of the type covered by official immunity, were malicious or willful and therefore stripped of the immunity's protection. *Davis v. Hennepin County,* 559 N.W.2d 117, 122 (Minn.App.1997), *review denied* (Minn. May 20, 1997).

A discretionary act is one for which an official must exercise "judgment or discretion." *Johnson v. State,* 553 N.W.2d 40, 46 (Minn.1996) (quoting *Elwood,* 423 N.W.2d at 677). A ministerial act involves merely the execution of a specific, absolute duty. *Kari v. City of Maplewood,* 582 N.W.2d 921, 923 (Minn.1998). Despite Dokman's later testimony that he had no intention of actually killing himself, the officers had no way of knowing his real intentions and were only responding to the information they had. The circumstances were tense and uncertain, and the officers were operating with little information from Dokman. Although the sheriff's department has procedures for dealing with suicide threats, each situation is unique and requires officers to use their judgment and exercise discretion in deciding on a plan of action. Thus, this situation fits within the scope of actions protected by official immunity.

We next consider whether the officers' conduct was malicious or willful. *Davis,* 559 N.W.2d at 122. Malice is defined as "the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right." *Rico,* 472 N.W.2d at 107 (citation omitted). The question of malice is an "objective inquiry into the legal reasonableness of an official's actions." *State by Beaulieu v. City of Mounds View,* 518 N.W.2d 567, 571 (Minn.1994).

There is no evidence in the record that the officers acted with malice in their conduct toward Dokman. There is no factual basis for Dokman's claim that the officers shot the chemicals into his home because they were angry about having to be outside on a cold night. Additionally, there is no support for Dokman's argument that the officers wanted to make him mad. The length of time the officers negotiated with Dokman and their cautious, graduated approach in dealing with him shows sensitivity and concern for his well being rather than an intent to harm him. There is no evidence to support malice on the part of the officers. We affirm the district court's grant of summary judgment.

## III.

Vicarious official immunity protects a governmental entity from liability based on the acts of an employee who is entitled to official immunity. *Wiederholt v. City of Minneapolis,* 581 N.W.2d 312, 316 (Minn.1998). Because we hold that the officers are entitled to official immunity, Hennepin County is protected from liability.

## DECISION

Because the officers had probable cause, they were authorized under Minn. Stat. § 253B.05 to seize Dokman. As such, respondents' actions were protected by qualified immunity. Because the officers' actions were discretionary, they were protected by official immunity. The district court did not err in granting summary judgment.

**Affirmed.**