**Harry JOHNSON, Appellant**
**(C7–01–1676),**

**Margot Siegel, et al., Appellants**
**(C4–01–1683),**

v.

**The CITY OF MINNEAPOLIS, et al., Respondents.**

Nos. C4–01–1683, C7–01–1676.

Supreme Court of Minnesota.

Aug. 14, 2003.

Michael C. Mahoney, Mahoney & Hagberg, Wayzata, MN, David F. Herr, Maslon Edelman Borman & Brand, Minneapolis, MN, for Appellants.

Susan Lee Trammele, Minneapolis City Attorney Office, Minneapolis, MN, for Respondent.

Susan Lynn Naughton, St. Paul, MN, Amicus Attorney League of Minn. Cities.

Paul Thomas Eidsness, Chanhassen, MN, Amicus Attorney Minnesotans for Protection of Constitutional Standards.

## OPINION

ANDERSON, RUSSELL A., Justice.

■ Appellants commenced an inverse condemnation action[1] against respondents, the City of Minneapolis and its development agency, the Minneapolis Community Development Agency (hereinafter referred to collectively as "the City"), seeking compensation for the diminishment in rents and value of their properties caused by a "cloud of condemnation" over their properties for many years while respondents pursued redevelopment of the property and later defended litigation brought by the developer. Following trial with an advisory jury, the district court concluded that respondents' conduct constituted a compensable taking of appellants' properties and awarded appellants damages. The court of appeals reversed, finding no compensable taking under the United States Constitution because respondents did not exercise "significant control" over the appellants' properties during the period for which compensation was sought. We conclude that the district court's extensive findings are not clearly erroneous and that the unique facts of this case require compensation under the Minnesota Constitution. We reverse.

In December 1983, the City adopted a redevelopment plan for three and one-half blocks in the southern part of Nicollet Mall in downtown Minneapolis as part of an effort to promote urban development around the Minneapolis Convention Center and increase the downtown Minneapolis tax base. The development district—from 9th Street to 11th Street and from Marquette Avenue to LaSalle Avenue—included commercial retail and office properties owned by appellants. In 1985, over the objection of the Mayor of Minneapolis, the City granted exclusive negotiating rights for the development of a retail project on south Nicollet Mall to La Societe Generale Immobiliere (LSGI), a French development corporation. The City then established a tax increment financing district within the development district and adopted a tax increment financing plan.

Over the mayor's veto, the City approved a development contract, executed on November 3, 1986, between LSGI and the City. The contract imposed mutually escalating obligations on both parties, requiring LSGI to secure anchor tenants for the project before the City was obligated to acquire the targeted properties by eminent domain. In addition, the development contract required LSGI to submit periodic progress reports to the City, which the City was required to keep confidential. The City also had the right to approve proposed project design plans and reserved the right to approve the final project design.

LSGI proposed a dome-and-tunnel design for Nicollet Mall, in which Nicollet Mall would be converted to a pedestrian-only street with a dome overhead and a tunnel underneath for automobile traffic. LSGI obtained preliminary letters of com-

---

1. Inverse condemnation is "a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency." *Alevizos v. Metropolitan Airports Comm'n of Minneapolis and St. Paul.* 298 Minn. 471, 477, 216 N.W.2d 651, 657 (1974) (quoting *Thornburg v. Port of Portland,* 233 Or. 178, 376 P.2d 100, 101 (1962)).

mitment from two potential anchor tenants, Nordstroms and Neiman Marcus. The City, however, did not approve of the dome-and-tunnel design. On November 3, 1987, the development contract's closing date, the City and LSGI entered into a post-closing agreement allowing LSGI to continue negotiating with anchor tenants while creating a second design plan that would maintain Nicollet Mall as an open urban street with no enclosure and at-grade transportation. The post-closing agreement required the City to deliver to LSGI a 99–year lease for all of the properties in the development district, which would be delivered at the time the City acquired the properties needed for the development project, and provided that "[e]ach of the parties hereto agrees to use their best efforts" to cooperate with each other.

On November 5 and November 16, 1987, less than two weeks after the post-closing agreement was signed, the mayor wrote letters to Nordstroms and Neiman Marcus regarding the LSGI development project. According to the district court, these letters, written while the confidentiality provision in the development contract was in place, suggested that LSGI had not been honest with the prospective anchor tenants and were intended "to discourage participation of the prospective anchor tenants in the project." Although LSGI continued to discuss with Neiman Marcus the possibility of having a store in its development project, the district court found that the letters had a detrimental effect on LSGI's ability to secure the prospective anchor tenants.

Less than a month after the mayor wrote to the prospective anchor tenants in an attempt to persuade them not to commit to the LSGI project, the City sent a letter to appellants and other owners of property that would be taken for the LSGI project. The letter informed them that the City had decided to "go forward" with the LSGI project, and, as an "initial step" in the process, the City would appraise their properties "which would be acquired if the development takes place." The letter, dated November 23, 1987, also noted "You should understand that by appraising the property the City is not making a definite commitment to acquire the same. Nor does it establish your eligibility for any relocation benefits or assistance you may be entitled to receive if your property is acquired." The City never informed appellants that there was a possibility that their properties would not be taken between the time this letter was sent and the commencement of LSGI's suit against the City, even after negotiations between the City and LSGI irreconcilably broke down, despite the fact that appellants made repeated calls and sent letters to city officials and staff questioning the status of the LSGI project and the acquisition of their properties.[2] The district court found that the November 23, 1987 letters and the subsequent events led appellants to reasonably believe that the LSGI project was going forward and, by indicating that the properties were to be appraised, that the properties would be taken.

---

**2.** In 1991, after LSGI filed suit, appellant Goldman wrote to the mayor seeking relief from the financial hardship caused by the vacancies in his building. The mayor responded:

It is unfortunate that your investments in the Nicollet Arcade Building and the Essex Building are not rewarding to you. The City of Minneapolis would like these buildings to be productive rather than demolished or boarded up, but we cannot buy them with no plans for development.
The [MCDA] buys property when there is a developer for it. At this time there is not a developer interested in your two properties that we know of.

On December 3, 1987, LSGI presented a second project design to the City, which the mayor vetoed. In January 1988, the City issued a public notice of default by LSGI based on LSGI's failure to secure anchor tenants for the project. LSGI submitted a third design proposal on March 17, 1988. The City approved the design and later overrode the mayor's veto of the project. However, the City later informed LSGI that in order to obtain sufficient support for the project, several changes would have to be made. These changes required LSGI to substantially modify the existing design plan. During this negotiation period between the City and LSGI, appellants continued to experience severe difficulty in retaining current tenants and attracting new tenants because of the possibility that their properties would be condemned.

On May 17, 1989, the City terminated all negotiations with LSGI and, shortly thereafter, the City recommended the transfer of $29 million from funds allocated for the LSGI project to a project on north Nicollet Mall that would include a Neiman Marcus store. On June 1, 1989, the City terminated the development contract and post-closing agreement with LSGI. The City did not inform appellants and other affected property owners that their properties would not be condemned for development.

LSGI sued the City in federal district court for specific performance of the development contract and post-closing agreement and filed a notice of lis pendens against all of the properties in the development district, including appellants' properties. LSGI prevailed at trial,[3] but the Eighth Circuit Court of Appeals reversed, finding that the City did not breach its contracts with LSGI because the contracts gave the City the right to approve the final design project. *La Societe Generale Im-*

*mobiliere v. Minneapolis Cmty. Dev. Agency,* 44 F.3d 629, 636–38 (8th Cir.1994). Although the City was ultimately successful in the LSGI action, the district court in this case found that the litigation nonetheless adversely affected appellants. The court found that the notice of lis pendens made appellants' properties unmarketable and the City was responsible for this loss in marketability because it never sought to have the notice of lis pendens removed until 1993 in a post-trial motion, which the federal district court granted.

Appellants sued the City in state court alleging that the City's actions constituted a taking under the federal and state constitutions. The district court dismissed the claims on the pleadings, but the court of appeals reversed and remanded for trial. *Siegel v. Minneapolis Cmty. Dev. Agency,* 1996 WL 229242 at *2 (Minn.App. May 7, 1996). Following trial, the district court concluded that appellants were entitled to compensation under the federal and state constitutions. The district court and the advisory jury found that the City had: (1) identified a specific geographic footprint that included appellants' properties; (2) in honoring the commitment to confidentiality, refused to provide information about the project to property owners; (3) not clearly communicated to appellants that acquisition of their properties might not occur and that they should maintain their properties to avoid loss of value in case their properties were not acquired; and (4) not informed appellants that the City had terminated the contract and negotiations with LSGI. From its findings, the district court concluded that: (1) the City's activities in connection with the LSGI project created a "cloud of condemnation" over the properties from at least November 23, 1987 until the LSGI suit

3. LSGI won a court-reduced award of $17,280,000.

was resolved in February 1995; (2) the City's actions significantly reduced the fair market value of appellants' properties and caused a loss of rental income, thereby causing a substantial and adverse economic impact on the properties and rendering appellants' businesses commercially impracticable; (3) the City uniquely burdened appellants by impairing their existing and prospective uses of the properties for an unreasonable period of time; and (4) the City interfered with appellants investment-backed expectations by disturbing their longstanding and existing uses of the properties. The district court also concluded that the City had abused its eminent domain power and acted in bad faith with respect to appellants. The district court awarded appellants $4,348,000 in damages plus interest, costs, expenses and attorney fees.[4]

The court of appeals reversed. The court held that the City's actions did not constitute a taking because the City never "significantly controlled" appellants' properties. *Johnson v. City of Minneapolis,* 649 N.W.2d 873, 886 (Minn.App.2002). The court reasoned that in the absence of significant control over the property, "the government's actions, even if they adversely affect the property, do not implicate constitutional protections." *Id.* at 882. We granted appellants' petition for further review and now must decide whether respondents' actions related to its redevelopment plans for Nicollet Mall and the subsequent litigation between the City and LSGI, which caused a diminishment in rental income and value of appellants' properties for several years, constituted a taking for the purposes of the constitutional requirement of compensation.

4. According to the district court, the jury's determination that the losses sustained by the Siegel/Goldman appellants amounted to $2,348,000 and the losses sustained by appellant Johnson amounted to $2,000,000 was

### 1. *Federal Constitution*

The parties agree that because respondents never took physical possession or control of appellants' properties, appellants' inverse condemnation claim under the federal constitution is in the nature of a claim for compensation for a regulatory taking rather than for a physical taking of property and that *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), applies in reviewing appellants' claims under the federal constitution.

■■■ Accordingly, and assuming that the law governing regulatory takings applies, the analysis used to determine whether a landowner is entitled to compensation for a regulatory taking under the United States Constitution depends on the effect of the regulation. If the regulation has the effect of permanently denying a property owner "all economically beneficial uses" of his property, the government is categorically required to pay compensation. *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 330, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (quoting *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)). Anything less than a complete taking of property requires the balancing test set forth in *Penn Central. Tahoe–Sierra,* 535 U.S. at 331, 122 S.Ct. 1465. This test requires the court to consider: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the

more than amply supported by the evidence presented at trial. The sufficiency of the evidence in support of the damages award is not at issue in this appeal.

government regulation. *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646. "In deciding whether a particular governmental action has effected a taking, this Court focuses * * * on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole." *Id.* at 130–31, 98 S.Ct. 2646.

■ Here, the record indicates that the value of appellants' properties was diminished but not completely eliminated. Therefore, the 3–prong *Penn Central* analysis controls the question of whether appellants are entitled to compensation under the federal constitution. Rather than apply the three *Penn Central* factors, the court of appeals applied a "significant control" test and concluded that because respondents never exercised "significant control" over the properties, appellants were not entitled to compensation under the Takings Clause. *See Johnson,* 649 N.W.2d at 884.

While it appears from case law that "significant control" over the property by the government plays a role in the *Penn Central* analysis, the court of appeals erred in applying a "significant control" test rather than the *Penn Central* analysis to determine whether a compensable regulatory taking occurred under the federal constitution.

■ Having concluded that the court of appeals applied an improper standard, we generally would either proceed to apply the correct standard or remand to the court of appeals for application of the proper standard. However, we decline to address the merits of appellants' taking claim under the United States Constitution or remand to the court of appeals for application of *Penn Central* because, as discussed below, we conclude that even if appellants' takings claim under the United States Constitution fails under *Penn Cen-*

*tral,* appellants are entitled to compensation under the Minnesota Constitution.

## 2. *Minnesota Constitution*

■ The Minnesota Constitution requires the state to pay just compensation when the taking of private property occurs: "Private property shall not be taken, destroyed or damaged for public use without just compensation." Minn. Const. art. I, § 13. A taking "include[s] every interference, under the right of eminent domain, with the possession, enjoyment, or value of private property." Minn.Stat. § 117.025, subd. 2 (2002). These constitutional and statutory provisions have been construed to mean that "the clear intent of Minnesota law is to fully compensate its citizens for losses related to property rights incurred because of state actions." *State by Humphrey v. Strom,* 493 N.W.2d 554, 558 (Minn.1992). The fact that no physical invasion of appellants' property occurred does not bar compensation under the damages provision of the state constitution. *Wegner v. Milwaukee Mut. Ins. Co.,* 479 N.W.2d 38, 40 (Minn.1991); *see also Johnson v. City of Plymouth,* 263 N.W.2d 603, 605 (Minn.1978) ("To be constitutionally compensable, the taking or damage need not occur in a strictly physical sense and can arise out of any interference by the state with the ownership, possession, enjoyment, or value of private property.").

■ While the general rule is that economic loss caused by "normal activities in connection with an urban renewal project, without more, does not constitute a de facto taking in a constitutional sense," an abuse of the power of eminent domain may be tantamount to a regulatory control, constituting a de facto taking "when that abuse is specifically directed against a particular parcel." *Orfield v. Housing and*

*Redev. Auth. of St. Paul,* 305 Minn. 336, 341–42, 232 N.W.2d 923, 927 (1975).

In *Orfield,* we affirmed the district court's decision that the property owner did not suffer compensable damage to his property as a result of a proposed redevelopment project that affected property owned by the plaintiff. *Id.* at 342, 232 N.W.2d at 927. Our decision was based on the findings of the district court—which we concluded were supported by the record—that the city never represented to the plaintiff that his property would be acquired, that the city advised the plaintiff "at all times" that his property was not scheduled for acquisition, and that the city and its agents "did not act in bad faith in its dealings with [the plaintiff] respecting the subject property." *Id.* at 340–41, 232 N.W.2d at 926–27.

This case is factually distinguishable from *Orfield.* Here appellants, although informed that the City's decision to appraise their properties for purposes of condemnation did not necessarily mean that their properties would be taken for redevelopment, were not informed that the City was not obligated to proceed with the development under the agreement with LSGI, were not apprised of the status of the development project, and were not informed when the LSGI project was effectively abandoned. From these findings, the district court concluded that the City misled the appellants "by their words, actions, and inactions * * * leading [appellants] to believe that the acquisition was going forward." Additionally, contrary to the district court's findings in *Orfield,* in this case, the district court found that the City "specifically targeted [appellants'] Properties [sic] for acquisition." *See Orfield,* 305 Minn. at 342, 232 N.W.2d at 927 ("It may well be that abuse of the power of eminent domain when that abuse is specifically directed against a particular parcel could constitute a de facto taking."). Finally, *Orfield* is also distinguishable on the grounds that here the district court concluded that the City had acted in bad faith with respect to appellants by failing to use their best efforts and by failing to cooperate with LSGI in meeting required deadlines.

We conclude that the cumulative effect of the City's actions with respect to the LSGI development, which the district court concluded substantially interfered with appellants' property rights, constituted an abuse of the City's condemnation authority and that appellants are therefore entitled to compensation under *Orfield.* *See Wegner v. Milwaukee Mut. Ins. Co.,* 479 N.W.2d 38, 42 (Minn.1991) ("Once a 'taking' is found, compensation is required by operation of law."). While each action taken by the City, analyzed separately, could be viewed as normal condemnation activity, the cumulative effect of the actions rendered appellants' properties unmarketable for years while the development was being negotiated and, later, in litigation. Because of the unique circumstances of this case, we find no basis for reversing the district court's findings and conclusions of law that the City specifically targeted appellants' properties and acted in bad faith and conclude that this case presents a narrow and rare instance in which precondemnation activity constituted a taking under the Minnesota Constitution.

By our decision today, we do not adopt a sweeping rule that property owners are entitled to compensation for any diminishment in value or loss of income caused by the prospect that their property will be condemned at some future date. Rather, our decision is limited to the particular facts presented.

Reversed.

PAGE and HANSON, JJ., took no part in the consideration or decision of this case.