or when it lapses. These appeals then may proceed.

**ARMOUR AND COMPANY, INC., an Arizona corporation, Appellant,**

v.

**INVER GROVE HEIGHTS, a Minnesota municipal corporation, Appellee.**

No. 92–2801.

United States Court of Appeals, Eighth Circuit.

Submitted May 14, 1993.

Decided Aug. 6, 1993.

James Bruce Fleming, Minneapolis, MN, argued, for appellant.

John Michael Baker, Minneapolis, MN, argued (Clifford M. Greene and Suesan Pace-Shapiro, on the brief), for appellee.

Before LOKEN, Circuit Judge, ROSS, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

ROSS, Senior Circuit Judge.

Appellant Armour and Company, Inc. (Armour) owns 32 acres of undeveloped land in the city of Inver Grove Heights, Minnesota (the city). This 32–acre tract of land is part of a larger 300–acre tract known as the southeast quadrant in Inver Grove Heights. As early as 1986, proposals had been made for development of the area as a discount shopping mall. The city actively and publicly pursued this proposal. The Armour tract of land has increased in value over the years as adjacent tracts have enjoyed public improvements, including the construction of interstate highways.

On May 30, 1991, the city formally entered into a development agreement with Minnesota Powerpark Limited Partnership (the developer) for the development of a shopping mall in the southeast quadrant, including Armour's tract of land. In this agreement, the city agreed to provide the developer with tax increment financing and utilization of the municipal power of eminent domain. The development agreement provided that if the developer was unable to acquire certain property within the development district, and the developer had fulfilled certain conditions precedent, the city would exercise its power of eminent domain to acquire specific parcels of property. The city retained the right to issue planning approvals and building permits to other parties.

Contrary to Armour's wishes, the agreement did not obligate the city to condemn any land until a series of preconditions for development were satisfied, including acceptance by the Metropolitan Council of comprehensive plan amendments and the resolution of serious traffic problems. The agreement also set forth other contingencies upon the occurrence of which the agreement would fail, such as failure to obtain approval for environmental impact statements, permits, variances and rezoning applications. Armour participated in the public debate prior to the city's execution of the development agreement and did not oppose the proposal. However, Armour admonished that the agreement should include the necessary financial guarantees to ensure condemnation of the property before the end of 1991.

Less than three months after execution of the development agreement, and prior to its termination, Armour filed this action contending that the agreement had already resulted in a temporary and permanent taking of its property under both the federal and Minnesota state constitutions. Upon the termination of the agreement, the permanent takings claim became moot and Armour now relies exclusively on a temporary takings claim. Armour does not contend that the city interfered with its legal right to sell, use or dispose of its land. Instead, Armour's takings claim is based on its contention that the development agreement and the concomitant planning activities between the city and the developer made the property less attractive to potential purchasers and hindered Armour's ability to sell its land for its full value.

I.

■ The Fifth Amendment provides that "private property [shall not] be taken for public use without just compensation." The essential purpose of this clause is to "bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central Transp. Co. v. New York*, 438 U.S. 104, 123–24, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) (quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)).

■ The Takings Clause originally was applied only to physical appropriations of property, but in 1922 the Supreme Court recognized that regulations on property will also be considered takings if they go "too far." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322

(1922). Just how far a regulation must go before it will be considered "too far" under the Fifth Amendment has not been specifically defined by formula or rule. *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659. Consequently, judicial determinations have relied on ad hoc factual inquiries and case-specific weighing of the competing public and private interests. *Id.* Resolution of each case "ultimately calls as much for the exercise of judgment as for the application of logic." *Andrus v. Allard*, 444 U.S. 51, 65, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979).

■ The Supreme Court has identified factors to guide courts in ad hoc factual inquiries. The factors include: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the government regulation. *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659. *See also Parranto Bros. v. New Brighton*, 425 N.W.2d 585, 591–92 (Minn.Ct.App.1988). "In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole." *Penn Central*, 438 U.S. at 130, 98 S.Ct. at 2662.

■ When reviewing land-use regulations that are reasonably related to promotion of the general welfare, it is uniformly established that "diminution in property value, standing alone, [cannot] establish a 'taking.'" *Id.* at 131, 98 S.Ct. at 2663. "Even if the appellants' ability to sell their property was limited during the pendency of the condemnation proceeding, ... [m]ere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are 'incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense.'" *Agins v. Tiburon*, 447 U.S. 255, 263 n. 9, 100 S.Ct. 2138, 2143 n. 9, 65 L.Ed.2d 106 (1980).

In *Kirby Forest Indus. v. United States*, 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984), the owner's land was targeted in 1967 by the National Park Service for a new national park. In 1974, "[a]fter seven years of desultory consideration of the matter," *id.* at 7, 104 S.Ct. at 2192, Congress finally passed a statute directing the Secretary of the Interior to acquire an area, including Kirby's tract, for a national preserve. In 1978, the government finally commenced a condemnation action, filed a notice of lis pendens, and publicized the condemnation proceeding. The government did not compensate the landowner for the value of its property before it actually acquired title to the land in 1982, although pre-condemnation activities had lasted almost fifteen years.

The landowner contended the cloud of uncertainty hovering over his land during the lengthy pre-condemnation period constituted a taking and accordingly he sought compensation for a portion of the pre-condemnation period. Despite this cloud, a unanimous Supreme Court rejected, as a matter of law, the argument that a taking had occurred prior to the formal condemnation in 1982. In reasoning equally applicable in the present case, the Supreme Court stated:

> Until title passed to the United States, petitioner was free to make whatever use it pleased of its property. The Government never forbade petitioner to cut the trees on the land or to develop the tract in some other way. Indeed, petitioner is unable to point to any statutory provision that would have authorized the Government to restrict petitioner's usage of the property prior to payment of the award. Nor did the Government abridge petitioner's right to sell the land if it wished. It is certainly possible, as petitioner contends, that the initiation of condemnation proceedings, publicized by the filing of a notice of *lis pendens*, reduced the price that the land would have fetched, but impairment of the market value of real property incident to otherwise legitimate government action ordinarily does not result in a taking. At least in the absence of an interference with an owner's legal right to dispose of his land, *even a substantial reduction of the attractiveness of the property to potential purchasers does not entitle the owner to compensation under the Fifth Amendment.*

*Id.* at 15, 104 S.Ct. at 2196–97 (citations and footnotes omitted) (emphasis added).

■ Here, Armour contends that the lengthy planning activities and the execution of the development agreement hindered its ability to sell its land for its full value, even though there was no legal restriction on its right to do so. The only evidence that was introduced concerning the economic impact on the value of the property was the affidavit of Mr. Kit Richardson, a real estate agent who attempted to sell the tract for Armour. Mr. Richardson vaguely asserted that "[m]any developers I have spoken with have flatly refused to consider development of the Property" because of the development agreement, and that since the agreement was cancelled, "there has been an increase in the general level of interest and activity in the Property."

Once a movant for summary judgment has properly supported its motion, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). Conclusory affidavits do not provide a basis upon which to deny motions for summary judgment. *Jackson v. Anchor Pkg. Co.,* 994 F.2d 1295, (8th Cir.1993). Mr. Richardson's affidavit is insufficient as a matter of law to establish that a genuine issue of material fact exists. Further, as we have previously discussed, even if Mr. Richardson's affidavit contained the least amount of substance, it is clear that mere fluctuations in the marketability of property owing to governmental action or regulation, standing alone, is insufficient to constitute a taking of a constitutional magnitude. And finally, the significance of the affidavit is further undermined by the fact that during the pendency of the development agreement, a potential purchaser, Homart Community Centers, Inc., proposed an option to purchase the property, contingent upon the failure of the discount mall proposal and the cancellation or nullification of the development agreement. Armour, however, apparently rejected this proposal.

Therefore, we conclude that Armour has failed to set forth specific facts to show that a genuine issue of material facts exists as to whether it suffered an economic impact of a constitutional magnitude, or that there was interference with its investment-backed expectations in the sale of the property as a result of the city's development and planning activities. A contrary holding in this case would effectively compel the government "to regulate by *purchase.* 'Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.'" *Andrus v. Allard, supra,* 444 U.S. at 65, 100 S.Ct. at 326 (quoting *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659).

■ We also reject Armour's argument that a lesser showing of an economic impact is required to demonstrate that a taking has occurred because this case falls within the so-called "enterprise" exception. The Minnesota Supreme Court imposes a relatively lighter burden of establishing a "substantial and measurable decline in the market value" where the alleged taking results from land-use regulations designed to benefit a specific government enterprise. *See McShane v. Faribault,* 292 N.W.2d 253, 258–59 (Minn. 1980) (zoning ordinance to benefit the Faribault Municipal Airport held to be a governmental enterprise). We reject this exception as applicable in the present case for two reasons. First, the city's involvement in the development agreement was not a governmental enterprise. The city is not in the business of developing and operating a discount shopping mall, but was involved with the project for the purpose of "assuring the comprehensive and unified development of [the property] in a manner that best serves the interests of the City and its residents." Development Agreement, article II, § 2.1(8). *See McShane, supra,* at 257 (ordinance designed to effect the planned and orderly development of land use is not an "enterprise"). Second, there still remains an insufficient showing to demonstrate a genuine issue of fact exists as to whether there is a "substantial and measurable decline in the market value" of the property in order to overcome the city's motion for summary judgment.

Accordingly, we conclude that the district court properly awarded summary judgment

in favor of the city. The judgment of the district court is affirmed.