1998 OK CIV APP 152

**Charles W. CALHOUN and Donna Kay Calhoun, husband and wife, Plaintiffs/Appellees,**

**v.**

**The CITY OF DURANT, an Oklahoma municipality, Defendant/Appellant,**

**and**

**The First National Bank in Durant, Defendant.**

**No. 85802.**

Court of Civil Appeals of Oklahoma, Division No. 1.

May 20, 1997.

Rehearing Denied July 15, 1997.

Certiorari Denied Oct. 8, 1998.

Dan Little, Little, Little, Little, Windel & Coppedge, Madill, for Plaintiffs/Appellees.

P.L. Pat Phelps, City Attorney for Durant, Durant, and Beverley Q. Watts, Watts & Watts, Oklahoma City, for Defendant/Appellant.

Diane Pedicord, Sue Ann Nicely, Oklahoma City, for Amicus Curiae Oklahoma Municipal League, Inc.

## OPINION

BUETTNER, J.

¶1 Charles W. and Donna Kay Calhoun (Calhoun) filed an inverse condemnation suit against the City of Durant which was tried to the court in two phases.[1] The court first determined that an inverse condemnation, or taking, had occurred. In the second phase, the court decided the time of the taking and damages. The trial court made extensive

---

1. "Inverse condemnation should be distinguished from eminent domain. Eminent domain refers to a legal proceeding in which a government asserts its authority to condemn property. [ ] Inverse condemnation is 'a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted.' " (Citations omitted.)

*Agins v. Tiburon,* 447 U.S. 255, 258, n. 2, 100 S.Ct. 2138, 2140, n. 2, 65 L.Ed.2d 106 (1980).

findings of fact relative to the first issue which are necessary for a complete understanding of the appellate issues. Pertinent findings included the following:

In 1967, the Plaintiff Charles Calhoun entered the Durant real estate development business and became involved in, among other ventures, the Twin Oaks Subdivision. In 1974, Plaintiffs purchased the 51 acres involved in this case from Mr. & Mrs. Billy Ray Ragle for the sole purpose of developing and selling rural homesites. During their discussions, Ragle informed Plaintiff of a rumor that Defendant City was interested in building a new city lake somewhere in the area. The parties discussed how this could increase the value of homesites, especially if the property was lakeside. Calhoun did not know about any city lake plan, but was aware of an ASCS plan to build a lake at one of 30 alternative locations, one of these being near this property. Calhoun took possession of the land and began surveying the lots and roads and advertising them for sale as the Lakewood Subdivision.

In 1976, the Defendant City began discussing the possibility of constructing a new water reservoir. Plaintiffs' property was listed as one of several alternative locations. In July 1978, Defendant City issued an interim report of the project listing all of Plaintiffs' 51 acres as part of the lake project. However, the Defendant City had financing problems that had to be resolved before a lake project could begin. On September 26, 1978, Defendant City held an election which resulted in passage of a bond proposal to finance the lake. On October 3, 1978, the City Council passed Resolution No. 1001 which approved an engineering contract with Benham–Blair Assoc. for its construction. When, on June 15, 1979, Defendant City adopted a detailed written land acquisition policy, it was clear that City intended to condemn all of Plaintiffs land. Negotiations began with many of Plaintiffs neighbors and some land purchases were consummated. However, Plaintiff was not contacted by the City for another 6 years.

After June 1979, planning, engineering and other work on the project was slow.

In 1985, Defendant City realized that additional financing would be necessary to build the project. Another election was held which resulted in passage of an additional sales tax to finance construction. On December 20, 1985, the City finally made its offer to purchase all of Plaintiff's 51 acres. Plaintiffs rejected this offer. Plaintiff testified that, on several occasions, he attempted to get the City to either make another offer, condemn his property, or state that they no longer had an interest in it. He says that their reply was that they were going to condemn, but only after they had completed negotiations with the other landowners.

On March 14, 1989, the City Council passed Resolution No. 1163 authorizing the filing of a condemnation action against any landowner who failed to sign a land sale contract by June 15, 1989. On October 16, 1989, Plaintiffs filed this case alleging that the City had taken his 51 acres by inverse condemnation action. Thereafter, in 1990, Defendant City filed its own condemnation action seeking condemnation of only 23 acres. The parties agree that the Defendant City sought all of Plaintiffs' property until the 1990 lawsuit was filed. The evidence is not clear as to whether construction had begun prior to the filing of this action; however, the parties agree that there was no increased waterflow over Plaintiffs land until after the filing.

### STANDARD OF REVIEW

¶2 A condemnation action "brought to obtain private property for public use is a special proceeding and not a civil action, to be carried out in accordance with the methods prescribed by the legislature." *Graham v. City of Duncan*, 354 P.2d 458 (Okla.1960)(syllabus by the court). The Oklahoma Supreme Court has stated that an "action in condemnation is a special proceeding and strictly controlled by the constitution and statutes." *Carter v. City of Oklahoma City*, 1993 OK 134, 862 P.2d 77, 80. In eminent domain actions, it is clear that the issue of damages is triable to a jury. 27 O.S.1991 § 2; 66 O.S.1991 § 55; 69 O.S.1991 § 1203(e)(1). However, the determination of

the character of use is a question for the court. Oklahoma Constitution, Art. 2, § 24; 66 O.S.1991 § 57. Also see *Board of County Com'rs of Creek County v. Casteel*, 522 P.2d 608, 610 (Okla.1974) (necessity of taking is question for the court); *Gaylord v. State ex rel. Dept. of Highways*, 540 P.2d 558, 561 (Okla.1975) ("whether construction of a frontage road and elimination of access to a highway constitutes a 'taking' requiring compensation is a question of law for the court, not a question of fact for a jury"); *Cunningham v. State ex rel. Oklahoma Planning and Resources Board*, 277 P.2d 990 (Okla.1954) (questions of fact as to reasonable necessity of taking and character of use of land sought to be taken, determined by court, will not be disturbed unless clearly against weight of evidence).

¶ 3   With respect to inverse condemnation cases, the Supreme Court, in *Henthorn v. Oklahoma City*, 453 P.2d 1013, 1016 (Okla. 1969), held that "the question of a taking in inverse condemnation under Section 24, Art. 2, Constitution is one for the jury in cases involving an impairment of right of ingress and egress to property by the building of a railroad track in or across a street bordering the property." *Henthorn v. Oklahoma City*, 453 P.2d 1013, 1016 (Okla.1969). In support of this holding, the court cited *Foster Lumber Co. v. Arkansas Valley and W.Ry.Co.*, 20 Okl. 583, 95 P. 224 (1908), on rehearing 20 Okl. 583, 100 P. 1110 (1909), and *Atchison, T. & S.F. Ry. Co. v. Terminal Oil Mill Co.*, 180 Okla. 496, 71 P.2d 617 (1937). These cases dealt with the narrow issue of whether a taking occurs when a railroad materially impairs a landowner's access to a public street.

■ ¶ 4   In *Henthorn*, the court extended the concept by holding that there can be a "taking" of private property by airplane flights which are over or in close proximity to land when such flights are continuous, frequent and low enough to constitute a substantial interference with use and enjoyment of property. The question of whether a continuing interference is substantial enough to constitute a "taking" is ordinarily a question for the jury. Also see *Mattoon v. City of Norman*, 1980 OK 137, 617 P.2d 1347, 1349 ("The question of substantial interference is one that the trier of facts must decide," citing *Henthorn*.); *State ex rel. Department of Transportation v. Hoebel*, 594 P.2d 1213, 1215 (Okla.1979) (it is for jury to decide under facts presented whether taking is present).

■ ¶ 5   Because both the preliminary question in inverse condemnation, whether there is a taking, and the subsequent question, the amount of damages if a taking occurred, are both triable to a jury, we review the conclusions reached by the trial court, insofar as its fact-finding, with the same deference we afford a verdict rendered by a well-instructed jury. Consequently, we will not disturb the findings of fact of a court or jury in an inverse condemnation action "if supported by any competent evidence." *Corbell v. State ex rel. Department of Transportation*, 1993 OK CIV APP 45, 856 P.2d 575, 579 (cert.denied).

¶ 6   On the other hand, questions of law are reviewable *de novo* by the appellate court which "claims for itself plenary independent and non-deferential authority to reexamine a trial court's legal rulings." *Kluver v. Weatherford Hospital Authority*, 1993 OK 85, 859 P.2d 1081, 1084 (hospital's status as a true public trust was a question of law).

### DISCUSSION

¶ 7   The issue to be decided is whether the trial court erred when it found that a "taking" of Calhoun's property occurred September 26, 1978. This is the date that city voters passed a proposal authorizing the issuance of bonds to expand the water treatment system. Calhoun argues that the bond issue included four projects: expansion of the water treatment plant, a water transmission line, a raw water pumping facility and land acquisition for the Little Blue River reservoir. It is undisputed that the bond issue provided that 70% of the funds would be used on the water treatment plant and the transmission line. See 62 O.S.1991 § 574(A). Calhoun then argues that the remaining 30% of the bond issue must have been intended to be used for the pumping facility and to purchase land for the reservoir.

¶ 8 The decision that a taking occurred when the bond issue was approved by the voters is inconsistent with Oklahoma law. As demonstrated by *Empire Construction, Inc. v. City of Tulsa*, 512 P.2d 119 (Okla. 1973), *cert.* denied, 414 U.S. 1094, 94 S.Ct. 725, 38 L.Ed.2d 551 (1973), a city may put plans on the drawing board and change the plans years later. Even if land acquisition costs had been specifically included in the bond proposal, we could not say that City was then bound to acquire all of the land necessary for the Little Blue River reservoir simply because voters had authorized the sale of bonds for such purpose. "The mere enactment of legislation which authorizes condemnation of property cannot be a taking. Such legislation may be repealed or modified, or appropriations may fail." *Danforth v. United States*, 308 U.S. 271, 286, 60 S.Ct. 231, 237, 84 L.Ed. 240 (1939).

¶ 9 A city must retain a certain amount of flexibility in implementing its projects, even after money is earmarked. In this case, City could have abandoned the reservoir project, as City suggests occurred between 1985 and 1989, or it could have found that land acquisition costs at the primary site had become prohibitive. *Board of Com'rs of Pontotoc County v. Rayburn*, 192 Okl. 624, 138 P.2d 820 (1943).

¶ 10 Future plans which include a landowner's property in a public use project are not sufficient to bring an inverse condemnation action. *April v. City of Broken Arrow*, 1989 OK 70, 775 P.2d 1347, 1353. "[T]he constitution measures a taking of property not by what a state says, or what it intends, but by what it does." *Hughes v. Washington*, 389 U.S. 290, 298, 88 S.Ct. 438, 443 19 L.Ed.2d 530 (1967). Stated otherwise, there can be no taking if the city's assertion of dominion and control over the property is "not so substantial of an interference so as to effectively destroy or impair the land's use-fulness." *Morain v. City of Norman*, 1993 OK 149, 863 P.2d 1246, 1249.

¶ 11 The Oklahoma Constitution provides in Article 2, § 24 that "[p]rivate property shall not be taken or damaged for public use without just compensation." In the case at bar, the dispositive question is whether, based on the facts as found by the trial court, a taking occurred so as to expose City to liability for justly compensating Calhoun. The pertinent facts are that City planned to construct a lake and those plans included condemning Calhoun's property to accomplish the project. From the time the plans were first announced until Calhoun filed his inverse condemnation action, more than ten years passed. However, the parties have not cited nor have we been able to find, any Oklahoma authority that mere passage of time in a project's life can constitute a taking of property. Courts have generally recognized two basic grounds that support inverse condemnation actions: physical taking and the enactment of regulations that substantially impair the property's usefulness.[2]

¶ 12 Physical invasion of the landowner's property may constitute a taking if it is severe enough to "effectively destroy or impair the land's usefulness." *State ex rel. Department of Transportation v. Hoebel*, 594 P.2d 1213, 1215 (Okla.1979). In the *Hoebel* case, the landowner was allowed to continue his suit for inverse condemnation of his land due to flooding she alleged was caused by the State's nearby highway construction. In *Henthorn v. Oklahoma City*, 453 P.2d 1013 (Okla.1969), the Supreme Court held that low, continuous and frequent airplane flights may be a "taking" if they constitute a substantial interference with the use and enjoyment of the property. The flights, causing noise, vibrations and other interferences, were a physical invasion of the property amounting to a taking of an air easement, which was subject to compensation.

---

2. Calhoun cites cases from other jurisdictions that have considered unreasonable delay or oppressive conduct as factors in determining whether a de facto taking has occurred. See, e.g., *Washington Market Enterprises, Inc. v. City of Trenton*, 68 N.J. 107, 343 A.2d 408 (N.J.1975); *Gaughen v. Commonwealth Department of Trans-portation*, 123 Pa.Cmwlth. 550, 554 A.2d 1008 (1989); and *Matter of Virginia Park*, 121 Mich. App. 153, 328 N.W.2d 602 (Mich.App.1983). However, we find that recognizing a third ground of taking, unreasonable delay, would be inconsistent with current Oklahoma law.

¶ 13 Regulation of a property's uses may also constitute a taking if the regulation (an overt act exercising dominion or control over the property) acts to destroy or impair the land's usefulness. In *Mattoon v. City of Norman*, 1980 OK 137, 617 P.2d 1347, plaintiff alleged that the city's adoption of a flood plain ordinance which prohibited all but a few limited uses of land along certain tributaries amounted to a taking without just compensation. Specifically, plaintiff asserted that the city was reserving certain properties for drainage purposes which would not have been necessary had city properly maintained its drainage channels. The Oklahoma Supreme Court reversed the trial court's grant of the city's demurrer and remanded the case with directions to reinstate plaintiff's action because the question of substantial interference is one for the fact-finder.

¶ 14 On the other hand, in *Morain v. City of Norman*, 1993 OK 149, 863 P.2d 1246, the trial court found that the city's ordinance for establishing policies, standards and responsibilities for the improvement and operation of drainage channels did not amount to an overt act of dominion and control over plaintiff's property which was periodically flooded. The city subsequently approved a plan for on-site and off-site drainage improvement for the plaintiff's land, a residential development. At trial, although the experts all agreed that the drainage improvements increased water flow to the area, the city's expert stated that the increase was not significant. Further, the evidence supported the fact that the flooding was caused in part by excessive or intense rainfalls. The Oklahoma Supreme Court affirmed the trial court's dual findings that the city had not committed an overt act exercising dominion and control over plaintiff's property (use of plaintiff's property was not a necessary part of a public improvement) and the interference was not so substantial so as to "effectively destroy or impair the land's usefulness." *Id.* at 1249.

¶ 15 Thus, some impairment of the land's usefulness is not enough. There must be substantial impairment resulting from an overt governmental act resulting in an assertion of dominion and control over property. Proposed, but unfulfilled plans to condemn land do not constitute a taking because such plans do not amount to an exercise of dominion and control over the property by the condemning authority and do not prohibit the landowner from exercising dominion and control over his property. *Empire Construction, Inc. v. City of Tulsa*, 512 P.2d 119, 123 (Okla.1973).

¶ 16 In the *Empire* case, Tulsa had adopted a master expressway plan but did not institute condemnation proceedings for ten years. Plaintiff's property would have been implicated in the re-alignment and enlargement of Riverside Drive. Tulsa even enacted an ordinance limiting access to streets in the expressway plan area. *Empire* answered "no" to the question whether "in the absence of an actual invasion of land, or of governmental interference with the owner's right to use the same, may inverse condemnation be maintained?" *Id.* at 121. The *Empire* case referred with approval to *City of Buffalo v. Clement*, 28 N.Y.2d 241, 269 N.E.2d 895, 321 N.Y.S.2d 345 (1971). In the *Clement* case, the court held that even "protracted delay attending final appropriation, cannot cast the municipality in liability upon the theory of a 'taking' for there was no appropriation of the property in its accepted legal sense." *Id.* 321 N.Y.S.2d 345, 269 N.E.2d at 903. Diminution in value because of delay, called condemnation blight, is relevant to valuation in the condemnation hearing.[3]

¶ 17 In the case at hand, the facts as found by the trial court and taken as true, do not support the legal conclusion that a taking occurred. There was no physical invasion of Calhoun's land and there was no regulatory action taken by the City. The City of Durant's proposed plans to condemn Calhoun's property, coupled with delay, does

---

3. The parties ably presented their positions in oral argument. Appellee urged an extension of the law of taking, from its current bases of physical invasion and regulatory taking, to include a third ground, unreasonable delay. Based upon United States and Oklahoma Supreme Court jurisprudence in this area, we decline to extend current Oklahoma law.

not constitute a taking.[4] As stated before, where a landowner's possessory rights were not disturbed, eminent domain proceedings may be abandoned without subjecting the condemning authority to an award of damages even after a jury trial and verdict fixing the amount of compensation, but before final judgment. *Board of Com'rs of Pontotoc County v. Rayburn,* 192 Okl. 624, 138 P.2d 820, 822 (1943). If there is no taking under these circumstances, which would require compensation, then there can be no taking under inverse condemnation under the same circumstances, or where the condemning authority has taken less action. The trial court erred as a matter of law in finding that a taking occurred under these facts.[5]

### EMINENT DOMAIN POLICY CONSIDERATIONS

¶ 18  The Oklahoma Legislature has stated policies at 27 O.S.1991 § 13:

Any person, acquiring agency or other entity acquiring real property for any public project or program described in Section 9 of this title [acquisition of real property for public use in projects in which federal, state or local funds are used] shall comply with the following policies:

1. Every reasonable effort shall be made to acquire, expeditiously, real property by negotiation.

\*  \*  \*  \*  \*  \*

7. In no event shall the time of condemnation be advanced, on negotiations or condemnation and the deposit of funds in court for the use of the owner be deferred, or any other coercive action be taken to compel an agreement on the price to be paid for the property.

¶ 19  Even if City did not use every reasonable effort to acquire the Calhoun property by negotiation expeditiously, or if City tried to coerce an agreement on the price, 27 O.S.1991 § 15 declares that § 13 does not create any rights or liabilities and "shall not affect the validity of any property acquisitions by purchase or condemnation." We need not decide whether City's conduct violated the policies expressed in § 13 because any such acts of noncompliance create no rights in a landowner nor liabilities in a condemning authority.

¶ 20  On appeal to this Court, City also contended that (1) the trial court erred when it determined that the highest and best use of the Calhoun property was as a residential development and (2) the trial court erred when it awarded damages based on the valuation of the property as residential, lake front home sites. Because we find that the trial court erred in its determination that a taking, or inverse condemnation occurred, we do not reach City's other propositions of error.

¶ 21  For the reasons stated, the judgment of the trial court is reversed and the matter is remanded to the trial court with directions to enter judgment in favor of the City of Durant.

REVERSED AND REMANDED.

JOPLIN, J., concurs.

HANSEN, P.J., concurs in result.

¶ 1  I concur with the result under the specific circumstances of this case. However in my view, there may be circumstances where a taking *does* occur absent physical

---

**4.** In *Kirby Forest Industries, Inc. v. United States,* 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984), the business owner of forest land in eastern Texas voluntarily stopped cutting because of a proposal to condemn the land for park land. Kirby Forest contended that it was effectively deprived of all significant interests associated with ownership long before the Government tendered payment. The United States Supreme Court found, however, that until "title passed to the United States, petitioner was free to make whatever use it pleased of its property...Nor did the Government abridge petitioner's right to sell the land if it wished. It is certainly possible, as petitioner

contends, that the initiation of condemnation proceedings, publicized by the filing of a notice of *lis pendens,* reduced the price that the land would have fetched, but impairment of the market value of real property incident to otherwise legitimate government action ordinarily does not result in a taking."

**5.** *White v. County of Newberry, South Carolina,* 985 F.2d 168, 173 (4th Cir.1993). (Appellate court may reverse a judgment entered on a jury verdict when the facts presented do not establish, as a matter of law, inverse condemnation).

invasion or enactment of regulations that substantially impair the property's usefulness.