Harry JOHNSON, Margot Siegel, et al., Respondents,

v.

The CITY OF MINNEAPOLIS, et al., Appellants.

Nos. C7–01–1676, C4–01–1683.

Court of Appeals of Minnesota.

Aug. 22, 2002.

Michael C. Mahoney, Havilah L. Solarz, Mahoney & Hagberg, P.A., Wayzata, MN, for respondents.

Jay M. Heffern, Minneapolis City Attorney, James A. Moore, Susan L. Trammell, Assistant City Attorneys, Minneapolis, MN, for appellants.

Considered and decided by KLAPHAKE, Presiding Judge, WILLIS, Judge, and HANSON, Judge.

## OPINION

WILLIS, Judge.

On appeal after remand in this takings dispute, appellants City of Minneapolis and Minneapolis Community Development Agency argue that the district court erred by finding a taking of property even though appellants did not control respondent property owners' use of their property. Appellants also contend that the district court erred by excluding from evidence a related United States Eighth Circuit Court of Appeals decision and by allowing respondents to offer hearsay testimony regarding their damages. Because we find that appellants' actions do not amount to a taking of respondents' property, we reverse the district court's award of damages, interest, attorney fees, and costs. But we affirm the district court's evidentiary rulings because we find no prejudice in the exclusion of the related federal decision, and we decline to address appellants' hearsay argument because it is inadequately briefed.

### FACTS

We previously addressed this case in *Siegel v. Minneapolis Cmty. Dev. Agency,* No. C0–95–1637, 1996 WL 229242 (Minn. App. May 7, 1996), *review denied* (Minn. July 10, 1996), and its companion decision, *614 Co. v. Minneapolis Cmty. Dev. Agency,* 547 N.W.2d 400 (Minn.App.1996). At that time, respondents Harry Johnson and Margot Siegel, et al. (collectively "respondents"), challenged, in part, the district

court's dismissal of their takings claim against appellants City of Minneapolis and Minneapolis Community Development Agency (MCDA) (collectively "appellants"). We reversed and remanded, concluding that respondents' allegations were sufficient to survive a motion to dismiss on the pleadings. *Siegel,* 1996 WL 229242, at *3–4. Respondents subsequently prevailed on the merits, and this appeal follows.

This case arises from appellants' efforts, beginning in 1983, to redevelop the south Nicollet Mall (the development district). Appellants' primary objectives were to promote the growth of the newly expanded convention center, to preserve downtown Minneapolis as a major retail center, to provide a commercial link between the development district and the convention center, to encourage more intensive development of the surrounding area, and to increase the area's tax base. After two years in which no developers showed interest in the project, in 1985 appellants began negotiating development rights with La Societe Generale Immobiliere (LSGI), a French corporation.

Appellant City of Minneapolis soon thereafter established Tax Increment Financing District Number 63 within the development district and adopted a tax-increment financing plan for the district. Minneapolis Mayor Donald M. Fraser created the "Committee on the Future of the Nicollet Mall" to assist in the planning, and the Minneapolis City Council approved the essential terms and conditions of a redevelopment agreement with LSGI (the development contract). The City Council overrode Mayor Fraser's veto of the agreement, and appellant MCDA and LSGI executed the development contract on November 3, 1986.

The development contract called for appellant MCDA to acquire several properties in the development district by exercise of its eminent-domain powers and to then lease those properties to LSGI for the construction of a shopping mall and office tower. The targeted area stretched from 9th Street to 11th Street and from Marquette Avenue to LaSalle Avenue, and it included the Arcade, Essex, 1009 Nicollet, 81 South 10th Street, 87 South 10th Street, and Handicraft buildings owned by respondent Siegel, et al., as well as the Physicians and Surgeons Building owned by respondent Johnson. The development contract contained a series of mutually escalating obligations that required LSGI to secure anchor tenants for the project before appellant MCDA was required to acquire the targeted properties and lease them to LSGI. The agreement also gave appellant MCDA the right to approval of the proposed project design plans and gave appellant City of Minneapolis the right to approval of the final project design. It also required LSGI to submit progress reports to appellants and, in turn, appellants agreed to keep all information contained in the progress reports confidential.

In December 1986, several of appellants' advisory committees began expressing reservations about LSGI's proposed "dome and tunnel" design. In October 1987, LSGI told appellants that it had secured a letter of commitment from Nordstrom's for a lease in the shopping mall and a letter of interest from Neiman Marcus to do the same. Appellants and LSGI temporarily resolved their design differences by closing the development contract with the stipulation that LSGI would develop a new design to keep the mall's open, urban-street atmosphere. This "post-closing agreement" required appellant MCDA, after the project's design had been approved, to acquire the properties in the targeted area and execute a 99–year lease

with LSGI for those properties. Shortly after closing the development contract, Mayor Fraser contacted Nordstrom's and Neiman Marcus in an apparent attempt to discourage their participation in the project. Indeed, several city council members testified at trial that the mayor's actions hampered LSGI's ability to secure anchor tenants for the project.

Several weeks after the execution of the post-closing agreement, appellants sent letters to all potentially affected property owners, including respondents, telling them that appellants had decided to go forward with LSGI's proposal. The letter stated that appraisers would be contacting the property owners to conduct appraisals of their properties, which "would be acquired if the proposed development takes place." But the letters also stated: "You should understand that by appraising the property the City is not making a definite commitment to acquire the same."

As LSGI continued negotiations with Neiman Marcus, appellant City of Minneapolis contacted that company about participating in a different development project at the north end of the Nicollet Mall. After appellant MCDA rejected several LSGI design proposals, appellants issued a public notice of default in January 1988 based on LSGI's failure to secure anchor tenants. Appellants and LSGI continued to negotiate over the design of the proposed mall, and in March 1988, LSGI presented a new design proposal, which appellant MCDA approved one month later. Mayor Fraser vetoed appellant MCDA's approval, but appellant MCDA overrode the veto. Appellant City of Minneapolis then told LSGI that, for the project to move forward, the proposed plan would need to be altered to garner sufficient support on the City Council, which had final design approval. The parties continued to negotiate over design and other contract issues, but appellants ultimately terminated all negotiations with LSGI on June 1, 1989. Respondents contacted appellants several times over the course of the LSGI negotiations, seeking information regarding the progress of the project, but appellants gave them no clear response and never told them that appellants would not be pursing acquisition of respondents' properties.

In June 1989, LSGI sued appellants in federal district court for breach of contract. *La Societe Generale Immobiliere v. Minneapolis Cmty. Dev. Agency,* 827 F.Supp. 1431, 1438 (D.Minn.1993). LSGI initially won a court-reduced award of $17,280,000, but the Eighth Circuit reversed the award in December 1994, concluding that appellants did not breach the contract because they had the right to final design approval. *La Societe Generale Immobiliere v. Minneapolis Cmty. Dev. Agency,* 44 F.3d 629, 636–38 (8th Cir.1994).

Respondents filed this suit in November 1994, alleging an unjust taking under both the United States and Minnesota constitutions. Before appellants began pursing the redevelopment project, respondents' properties had low vacancy rates and were profitable. Appellants' appraisers placed the following values on respondents' properties: $3,085,000 for the Arcade; $2,400,000 for the Essex; $5,133,000 for all of 1009 Nicollet, 81–87 South 10th Street, and the Handicraft; and $4,000,000 for the Physicians and Surgeons Building. Respondents received little clarifying information from appellants during the redevelopment process, and they were therefore unable to answer their tenants' questions regarding the future of the buildings or give them any assurances in that regard. As a result, some tenants left and respondents had difficulty replacing them, resulting in a decline in respondents' rental income. Total rents for the

properties increased 8.3% from 1984 to 1985, but decreased 4.9% in 1986, 10.2% in 1987, 14.0% in 1988, 3.3% in 1989, 22.5% in 1990, 22.5% in 1991, and 2.8% in 1992. Total rents then increased by 10.8% in 1993, 0.1% in 1994, and 9.9% in 1995. In 1997, the Arcade sold for $2,750,000, and the next year the Essex sold for $1,100,000. At trial, appellants offered several alternative explanations for the tenants' relocation and the decreased property values, including an increased amount of rental space available in the surrounding area and the deterioration of respondents' properties.

As already noted, the district court granted appellants' motion to dismiss on the pleadings, finding that respondents' substantial losses did not amount to a taking. *Siegel*, 1996 WL 229242, at \*2. On appeal, the issue before this court was whether respondents' pleadings, which alleged a taking of all economically viable uses for their properties, but not a total loss of all value, sufficiently alleged a taking. *Id.; see 614 Co.*, 547 N.W.2d at 406–07. Despite "ample doubts about [respondents'] ability to prove its cause of action," this court reversed, finding that

> [d]ismissal of [respondents'] claims on the pleadings requires an unduly constricted view of the holding of *Lucas [v. S.C. Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992)]. Although the pleadings state no claim of total worthlessness, the pleadings permit proof that [appellants'] actions left appellants without economically viable rental and development uses for their property and, therefore, that [respondents] have a right to recovery under the Takings Clause.

*Siegel*, 1996 WL 229242, at \*4, \*2.

On remand, the district court concluded that the record did not present a categorical taking as contemplated by *Lucas*. In-stead, the district court found appellants liable for unjustly taking respondents' properties under both the federal standard in *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), and the Minnesota standard in *Orfield v. Hous. & Redev. Auth. of the City of St. Paul*, 305 Minn. 336, 232 N.W.2d 923 (1975), and its progeny. In an exceptionally thorough order and memorandum, the district court found that appellants violated the standard set out in *Penn Central* by (1) uniquely burdening respondents by impairing their existing and prospective uses of the property for an unreasonable period of time, (2) causing a substantial and adverse economic impact on the properties, and (3) interfering with respondents' investment-backed expectations by disturbing their longstanding and existing uses of the properties. The court also found that appellants violated the Orfield standard by abusing their eminent-domain powers and by acting in bad faith. Specifically, the court found that

> [t]he City abused its power of eminent domain because (1) the City and LSGI entered into a contract that invoked its eminent domain power, a power otherwise unavailable to a private party; (2) the City reserved the right to abandon its contract partner at the last minute; (3) the City agreed to and did keep material information from the property owners; (4) the City agreed to specific performance as a remedy for breach of contract; (5) the City reversed course at closing; (6) the City, despite reversing course, sold the bonds to acquire the property and sent appraisers to the targeted property to begin the acquisition process; (7) the City severely undermined the ability of its contract partner to perform its end of the bargain; and

(8) the City unreasonably delayed the official decision-making process.

Based on an advisory jury's findings, the district court awarded respondents Siegel, et al., $2,348,000 in damages and $1,191,687 in interest and awarded respondent Johnson $2,000,000 in damages and $1,015,065.59 in interest. The court later awarded respondent Siegel, et al., $444,319.35 in attorney fees and $27,407.75 in costs and expenses and awarded respondent Johnson $441,845.10 in attorney fees and $27,397.17 in costs and expenses. The district court denied appellants' motion to amend the findings or, in the alternative, for a new trial. This appeal follows.

## ISSUES

I. Did the district court err by finding that a taking occurred?

II. Did the district court err by excluding from evidence a related Eighth Circuit decision and by allowing respondents to offer hearsay testimony regarding their damages?

## ANALYSIS

### I.

■ The United States and Minnesota constitutions prohibit governments from taking private property without just compensation. U.S. Const. amend. V ("nor shall private property be taken for public use without just compensation"); Minn. Const. art. I, § 13 ("Private property shall not be taken, destroyed or damaged for public use without just compensation."). Appellants contend that the district court erred by finding that a taking had occurred under both the federal takings standard in *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), and the Minnesota standard in *Orfield v. Hous. & Redev. Auth. of the City of St.*

*Paul*, 305 Minn. 336, 232 N.W.2d 923 (1975). Whether a taking has occurred is a question of law, which we review de novo. *Fitger Brewing Co. v. State*, 416 N.W.2d 200, 205 (Minn.App.1987), *review denied* (Minn. Feb. 23, 1988).

■ A taking occurs either by physical invasion of property or by other activity that so limits the use of property that it constitutes a taking. *Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 121 S.Ct. 2448, 2457, 150 L.Ed.2d 592 (2001). The principle that governmental activity alone may constitute a taking if it limits the use of property finds its roots in Justice Oliver Wendell Holmes's often-cited, but not overly instructive, statement that, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). Courts have attempted to refine this concept over the years, but it still eludes sharp definition. As a result, analysis of such takings cases "often relies heavily on reasoning by analogy to previous takings cases." *Zeman v. City of Minneapolis*, 552 N.W.2d 548, 552 n. 3 (Minn.1996). To that end, courts have developed context-specific tests to narrow the inquiry into whether a taking has occurred. These include the federal standard in *Penn Central* and the Minnesota standard in *Orfield*, and the progeny of those cases.

### A. Federal Takings Standard.

Appellants argue that no taking occurred under the *Penn Central* standard because appellants placed no restrictions on respondents' uses of their properties. Appellants claim, therefore, that this case is similar to *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984), where the United States Supreme Court found that no tak-

ing occurred under the *Penn Central* standard because the government did not significantly interfere with the property owner's use of its property.[1]

In *Penn Central*, the United States Supreme Court reviewed New York City's Landmarks Preservation Law, which was enacted to meet concerns that historic buildings were being destroyed without sufficient consideration of their historic, cultural, and architectural significance. *Penn Central*, 438 U.S. at 108–09, 98 S.Ct. at 2651. The law gave a commission authority to designate certain properties as, for example, a "landmark" and thereby restrict the owner's use of the property. *Id.* at 110–12, 98 S.Ct. at 2652–53. The commission designated Grand Central Terminal a "landmark" and denied a request from its owner, Penn Central Transportation Company, to construct an office building on top of the terminal. *Id.* at 115–16, 98 S.Ct. at 2654–55. Penn Central sued, alleging that the commission's actions amounted to an unjust taking of its property. *Id.* at 119, 98 S.Ct. at 2656.

In affirming the decision of New York Court of Appeals that no taking occurred, the Court established several factors for courts to consider when determining whether governmental activity so limits an owner's use of property that the activity constitutes a taking. *Id.* at 124, 98 S.Ct. at 2659; *see Zeman*, 552 N.W.2d at 552 n. 3 (noting that "[s]cholars seem to agree that *Penn Central* provides the best formulation of the factors the Supreme Court deems important to takings analyses." (citations omitted)). These factors include the economic effect on the property owner, the extent to which the activity interferes with the owner's reasonable, investment-backed expectations, and the character of the governmental action. *Id.; see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992) (describing a per se exception to the *Penn Central* analysis that applies when the governmental activity "denies all economically beneficial or productive use of land"). The *Penn Central* standard is premised on the belief that,

> while most burdens consequent upon government action undertaken in the public interest must be borne by individual landowners as concomitants of the advantage of living and doing business in a civilized community, some are so substantial and unforeseeable, and can so easily be identified and redistributed, that justice and fairness require that they be borne by the public as a whole.

*Kirby Forest v. United States*, 467 U.S. at 14, 104 S.Ct. at 2196 (quotations omitted). Because this case concerns governmental activity in a condemnation context, *Kirby Forest* and *Armour & Co., Inc., v. Inver Grove Heights*, 2 F.3d 276 (8th Cir.1993), are particularly relevant in applying *Penn Central* here.

In *Kirby Forest*, the federal government began targeting property owned by Kirby Forest Industries, Inc., in 1967 as a part of an effort to preserve a wilderness area in east Texas. *Kirby Forest*, 467 U.S. at 6, 104 S.Ct. at 2192. Congress finally passed legislation in 1974 that created a national park in the area and authorized the Secretary of the Interior to ac-

---

1. We do not address appellants' argument that the district court erred by following this court's interpretation of *Lucas* in the first appeal because the district court relied on *Penn Central* and *Orfield*, not *Lucas*, in its analysis. *See Bloom v. Hydrotherm, Inc.*, 499 N.W.2d 842, 845 (Minn.App.1993) (noting that an appellant cannot prevail on appeal unless an alleged error is also prejudicial), *review denied* (Minn. June 28, 1993). Neither party disputes the district court's abandonment of a *Lucas* analysis.

quire land for the park, including several thousand acres of Kirby Forest's property. *Id.* at 7, 104 S.Ct. at 2192. After negotiations to purchase appellant's land failed, the government began condemnation proceedings in 1978 and filed a notice of lis pendens that notified the public of the action. *Id.* The federal district court referred the matter to a special commission to determine the compensation due Kirby Forest. *Id.*, 104 S.Ct. at 2193. Kirby Forest objected to the commission's recommendation of $2,331,202, arguing that the award should also include interest accruing from the date the government began the condemnation proceedings. *Id.* at 8, 104 S.Ct. at 2193. The district court eventually adopted the commission's recommendation in 1981, but it also awarded interest on that amount from 1978, concluding that "the institution of condemnation proceedings had effectively denied [appellant] economically viable use and enjoyment of its property." *Id.* (quotation omitted). On appeal, a unanimous United States Supreme Court reversed the award of interest because it found that no taking occurred before completion of the condemnation action. *Id.* at 14–15, 104 S.Ct. at 2196–97. After setting out the *Penn Central* standard and the theory underlying it, the Court reasoned:

> [W]e do not find, prior to the payment of the condemnation award in this case, an interference with petitioner's property interests severe enough to give rise to a taking under the foregoing theory. Until title passed to the United States, petitioner was free to make whatever use it pleased of its property. The Government never forbade petitioner to cut the trees on the land or to develop the tract in some other way. Indeed, petitioner is unable to point to any statutory provision that would have authorized the Government to restrict petitioner's us-

age of the property prior to payment of the award.

> Nor did the Government abridge petitioner's right to sell the land if it wished. It is certainly possible, as petitioner contends, that the initiation of condemnation proceedings, publicized by the filing of a notice of *lis pendens*, reduced the price that the land would have fetched, but impairment of the market value of real property incident to otherwise legitimate government action ordinarily does not result in a taking. At least in the absence of an interference with an owner's legal right to dispose of his land, even a substantial reduction of the attractiveness of the property to potential purchasers does not entitle the owner to compensation under the Fifth Amendment.

*Id.* (internal citations omitted).

The Eighth Circuit adopted this reasoning in *Armour*, where the City of Inver Grove Heights, Minnesota, targeted land for a shopping-mall development, including land owned by Armour and Company, Inc. *Armour*, 2 F.3d at 277. The city entered into an agreement that required the developer to meet certain conditions before the city became obligated to exercise its eminent-domain powers. *Id.* Armour asked for a guarantee that the properties within the area would be acquired, and, when the city refused to give such a guarantee, Armour sued for unjust taking. *Id.* In affirming summary judgment for the city, the Eighth Circuit relied on *Kirby Forest's* holding that, as a matter of law, no taking occurred before the completion of the condemnation action. *Id.* at 278. The court found that the record showed, at best, that the city's actions impaired the marketability of Armour's property and that there was no evidence that the city imposed any legal restrictions on Armour's use of its property. *Id.* at 279. As a result, the

Eighth Circuit concluded that there was no issue "as to whether [appellant] suffered an economic impact of a constitutional magnitude, or that there was interference with [appellant's] investment-backed expectations." *Id.*

■ Thus, as illustrated by *Kirby Forest* and *Armour,* no taking occurs under the *Penn Central* standard in a condemnation setting unless a governmental entity exerts significant control over an owner's use of property before actually acquiring the property. In the absence of governmental control that significantly interferes with an owner's use of property, the government's actions, even if they adversely affect the property, do not implicate constitutional protections.

Other appellate courts have reached similar conclusions in condemnation settings. For example, in *City of Norwood v. Cannava,* 45 Ohio St.3d 238, 543 N.E.2d 802 (1989), the Ohio Supreme Court addressed the issue of whether a taking occurs when a governmental authority initiates condemnation proceedings or only when it actually takes physical possession of the property. *Id.* at 803. The property owners argued that the taking occurred at the institution of the proceedings because their rental income and property values declined then. *Id.* at 805. The court relied on *Kirby Forest* and rejected this argument, finding that

> [w]hile the initiation of condemnation proceedings may reduce the rental value of property, impairment of rental value incident to otherwise legitimate governmental action ordinarily does not constitute a taking.

*Id.* (citation omitted). The court concluded that no taking occurred because the owners retained full possession of their property and continued to receive rental income, and, thus, the owners "were not dispossessed or deprived of economically

viable use of their property prior to the date the [governmental authority] took possession of the property." *Id.*

Similarly, in *Wilkinson v. Dallas/Fort Worth Intern. Airport Bd.,* 54 S.W.3d 1 (Tex.App.2001), several property owners alleged that prolonged planning by the Dallas/Fort Worth International Airport Board (D/FW) for a runway expansion caused the owners difficulty in selling their homes or obtaining financing. *Id.* at 7. The owners claimed that D/FW's process of decision-making and its failure to keep promises regarding the acquisition of the owners' properties contributed to the owners' economic difficulties. *Id.* In affirming summary judgment for D/FW, the Texas Court of Appeals concluded that no taking occurred because the owners had not shown "a significant interference" with their property interests. *Id.* at 19. The court went on to state:

> To the extent [the owners] allege a taking based on D/FW's pre-condemnation proceedings without restricting appellants' use of their property, such claims have been routinely rejected by federal courts.

*Id.* at 19 (citing *Kirby Forest,* 467 U.S. at 15, 104 S.Ct. at 2196–97; *Saffold v. Carter,* 739 F.Supp. 1541, 1544 (S.D.Ga.1990)). Likewise, in *Calhoun v. City of Durant,* 970 P.2d 608 (Okla.Civ.App.1997), the Oklahoma Court of Appeals reversed the trial court's finding of a taking, holding:

> There was no physical invasion of Calhoun's land and there was no regulatory action taken by the City. The City of Durant's proposed plans to condemn Calhoun's property, coupled with delay, does not constitute a taking.

*Id.* at 613–14 (citing *Kirby Forest,* 467 U.S. at 15, 104 S.Ct. at 2196–97).

## B. Minnesota Takings Standard.

In addition to applying the *Penn Central* analysis, Minnesota courts employ a standard described in *Orfield*, and elaborated on in subsequent cases, when a property owner claims that a government entity's abuse of its eminent-domain powers amounts to a taking. Appellants here argue that no taking occurred under the *Orfield* standard because respondents retained full control over their property.

In *Orfield*, the Housing and Redevelopment Authority of the City of St. Paul (the city) proposed an urban-renewal project that included the Orfields' apartment building. *Orfield*, 305 Minn. at 337, 232 N.W.2d at 924. In connection with this project, owners whose properties were designated "substandard" could request that the city acquire the properties. *Id.* at 338, 232 N.W.2d at 925. The Orfields asked the city to buy their "substandard" property, but the city declined because it had allocated its federally provided funds for other, higher-priority properties first. *Id.* at 338–39, 232 N.W.2d at 925. But the city encouraged the Orfields to keep their property in good condition because the price they would receive if the city purchased their property depended on the value at the time of the purchase. *Id.* The city eventually acquired the properties on either side of the Orfields' building, but did not purchase their building. *Id.* at 339, 232 N.W.2d at 926. Many of the Orfields' tenants soon left, and this caused a decline in the property's value and rental income. *Id.* But the court concluded that no taking occurred because

economic loss caused by the altered character of a neighborhood due to normal activities in connection with an urban renewal project, without more, does not constitute a de facto taking of the property in a constitutional sense. Fluctuations in value of property which may occur by reason of activity undertaken in connection with a government project of this type are incidents of ownership, and a reduction in value so occurring cannot be considered a taking in a constitutional sense.

*Id.* at 341, 232 N.W.2d at 927. The court then stated:

It may well be that abuse of the power of eminent domain when that abuse is specifically directed against a particular parcel could constitute a de facto taking.

*Id.* at 342, 232 N.W.2d at 927 (citation omitted). Nevertheless, the court found no such abuse because the city did not promise that it would acquire the Orfields' property and it did not abuse its discretion in its use of its allocated funds. *Id.*

This court subsequently elaborated on *Orfield's* general pronouncement regarding abuses of the eminent-domain process, finding that there is no such abuse

if the state makes it clear to the owners there may be no taking, does not abuse its discretion by abandoning a plan to take, and urges the owners to make necessary property improvements.

*Fitger*, 416 N.W.2d at 208. This court further defined *Orfield's* reach as follows:

We find no authority permitting us to expand the concept of de facto taking, suggested in *Orfield*, to a case where the landowner's freedom of choice on improvements is not substantially destroyed by state action. Absent such control over the owner's use of its property, we are dealing with normal "incidents of ownership."

*Id.* (quoting *Orfield*, 305 Minn. at 341, 232 N.W.2d at 927). *Fitger* arose from the state's announcement in 1969 of a plan to extend an interstate highway through Duluth along a route that would require purchasing some of Fitger's brewery facilities. *Id.* at 201–02. At the same time, Fitger

faced major pollution-control expenditures and was concerned about how the proposed route would affect its investment in the required improvements. Fitger asked the state about the status of the proposed project and was told that the plan was still under consideration and that a final proposal was expected within the next several months. *Id.* at 202. No final proposal was made within the next year, but a newspaper account at the time quoted transportation department officials as saying that the proposed route "will mean 'taking' (condemning) everything on the south side of Superior Street from the Fitger Brewery to Eighth Avenue East." Despite continued consideration of several proposals, all involving Fitger's property, Fitger received no assurances over the next several years that the state would, in fact, purchase the property. *Id.* at 202–04. Fitger closed the brewery in 1972 in apparent reliance on the state's earlier announced plan to acquire the property and the impracticality of making the necessary pollution-control expenditures in the face of the anticipated acquisition. *Id.* at. 203–04. Three years later, the state decided that the project would not require taking Fitger's property. *Id.* at 204. This court reversed the district court's finding of a taking because "the state did not physically or legally prevent the owner's use of the property or force its closing." *Id.* at 208.

## C. Application of Takings Standards.

■ Although *Penn Central* arose in the context of governmental regulation and *Orfield* arose in the context of governmental use of the eminent-domain power, courts have read both cases to stand for the proposition that no taking occurs unless the governmental activity significantly restricts a property owner's freedom to choose how to use the property. *See Kirby Forest*, 467 U.S. at 14–15, 104 S.Ct. at 2196–97; *Fitger*, 416 N.W.2d at 208.

Thus, it is not enough under either *Penn Central* or *Orfield* for property owners to show that the government's actions substantially impaired the value of their properties—those actions must also exert significant control over the owners' use of their properties. *See id.; Fitger*, 416 N.W.2d at 208. In both *Kirby Forest* and *Fitger*, the degree of governmental control did not rise to the level of a taking because the owners there remained substantially free to use their property as they wished. *Id.; Fitger*, 416 N.W.2d at 208. Therefore, unless the governmental entity exerts a degree of control over property greater than that shown in *Kirby Forest* and *Fitger*, the property owner's loss is simply a "concomitant[ ] of the advantage of living and doing business in a civilized community." *Kirby Forest*, 467 U.S. at 14, 104 S.Ct. at 2196 (quotations omitted); *see Fitger*, 416 N.W.2d at 208.

Here, nothing in the record suggests that appellants exercised greater control over respondents' property than the governmental entities did in *Kirby Forest* and *Fitger*. The record supports the district court's findings used in its *Penn Central* analysis that appellants' actions adversely affected the value and rental income of respondents' property. The district court also found, relying on *Orfield* and *Fitger*, that appellants failed to clearly communicate that the project might not go forward, failed to urge respondents to improve their properties, and acted in bad faith in abandoning the project. But as in *Kirby Forest* and *Fitger*, respondents here remained substantially free to use their property as they pleased throughout the period during which appellants pursued the development project. The district court did not find, and the record does not show, that appellants restricted respondents' rights to continue to rent their properties, to use them for other purposes,

or to dispose of them. Indeed, the alleged impairment to the property in *Kirby Forest* was even greater than here because the property at issue in that case was subject to a Congressional mandate that required the acquisition of Kirby Forest's property for national park purposes. Thus, it was a foregone conclusion that Kirby Forest would be forced at some point to sell its property to the government. Here, respondents' properties were subject only to the conditional obligation in the development contract between appellants and LSGI, and that provision was never triggered because appellants rejected LSGI's design proposal. As a result, the degree of governmental control in *Kirby Forest* and *Fitger* is legally indistinguishable from appellants' control, or lack thereof, over respondents' property here. Thus, we are constrained to conclude that the district court erred in finding that a taking occurred here.

While the record reasonably supports the district court's findings that appellants' bad faith and unreasonable delay caused respondents to suffer economic loss, that is not sufficient under *Kirby Forest* and *Fitger*. The record must also establish that appellants exercised significant control over respondents' use of their properties. The record here does not show such control. Respondents knew that appellants might not acquire their properties, and respondents continued to use the properties as they had in the past. Without finding that appellants controlled respondents' properties in a constitutionally significant manner, the district court essentially reprimanded appellants for their bad conduct. And while appellants' conduct may well deserve reprimand, it does not provide sufficient grounds for finding that a taking of respondents' properties occurred. Thus, as in *Kirby Forest* and *Fitger*, respondents' losses do not amount to an unconstitutional taking, but are the unfortunate result of the risks of living in a civilized society. We, therefore, reverse the district court's awards to respondents.

Our holding is not inconsistent with this court's prior opinion in this case in which we found that respondents sufficiently alleged a taking to survive a motion to dismiss on the pleadings. There, although we expressed reservations regarding respondents' ability to prove their claims, we concluded that respondents' claims that appellants "radically curtailed," "inhibited," and even "precluded" respondents' use of their properties sufficiently alleged a taking. We simply conclude that, after trial, the record does not support a finding that a taking occurred.

## II.

Finally, appellants allege that the district court erred by preventing them from introducing evidence of the decision in *La Societe Generale Immobiliere v. Minneapolis Cmty. Dev. Agency*, 44 F.3d 629 (8th Cir.1994), on the grounds that it was irrelevant and misleading. We will not reverse a district court on evidentiary rulings unless the court clearly abuses its discretion and prejudices the adverse party. *Zaluckyj v. Rice Creek Watershed Dist.*, 639 N.W.2d 70, 77 (Minn.App.2002). Here, appellants cannot show they were prejudiced by the district court's exclusion of the Eighth Circuit's decision because the district court's finding of a taking was not based on the legality of appellants' conduct toward LSGI, which was the issue addressed by the Eighth Circuit's decision, but rather on appellants' unreasonable delay in the official decision-making process and misleading words, actions, and inactions. *See State v. Tereau*, 304 Minn. 71, 73–74, 229 N.W.2d 27, 28 (1975) (finding no prejudice when the alleged evidentiary error did not affect the district court's decision).

Appellants also assert that the district court erred by allowing respondents to present hearsay testimony regarding the reasons that they lost tenants during appellants' pursuit of the development project. We generally decline to address issues that a party fails to adequately brief. *State, Dep't of Labor & Indus. v. Wintz Parcel Drivers, Inc.*, 558 N.W.2d 480, 480 (Minn.1997). Here, appellants make no argument as to which specific statements are hearsay, how the court abused its discretion, or why the testimony prejudiced their case. Appellants' mere averments of error offer no real argument for our review, and, thus, we decline to address the issue.

## DECISION

The district court erred by finding that appellants' actions constituted a taking of respondents' properties when appellants did not significantly control respondents' use of their properties. Appellants suffered no prejudice by the district court's exclusion of the Eighth Circuit's related decision, and we do not reach appellants' hearsay argument because it is inadequately briefed.

**Affirmed in part and reversed in part.**